*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0132p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MARY LUE SCHOTT,

               *Plaintiff-Appellee,*

CAROL LEVY,

               *Plaintiff Appellee/*
               *Cross-Appellant,*

      *v.*

JANET OLSZEWSKI, in her capacity as Director of the
Michigan Department of Community Health, and
MARIANNE UDOW, in her capacity as Director of the
Michigan Family Independence Agency,
               *Defendants-Appellants/*
               *Cross-Appellees.*

Nos. 03-2490/2536

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 96-75364—George E. Woods, District Judge.

Argued: October 27, 2004

Decided and Filed: March 15, 2005

Before: BOGGS, Chief Judge; GILMAN, Circuit Judge; SARGUS, District Judge.[*]

---

## COUNSEL

**ARGUED:** Morris J. Klau, STATE OF MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Detroit, Michigan, for Appellants. Jacqueline Doig, CENTER FOR CIVIL JUSTICE, Saginaw, Michigan, for Appellees. **ON BRIEF:** Morris J. Klau, STATE OF MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Detroit, Michigan, for Appellants. Jacqueline Doig, CENTER FOR CIVIL JUSTICE, Saginaw, Michigan, for Appellees.

---

[*]The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge.  Mary Lue Schott and Carol Levy applied to Michigan's Medicaid program for coverage of their emergency hospitalization and medical bills. Schott's claims are not at issue in this appeal.  Levy, however, paid for some of the services that she received while awaiting the long-delayed approval of her application.   The state agencies administering the Medicaid program later refused to reimburse her for the money she spent out-of-pocket for her medical care.  Levy filed suit against the officials in charge of these state agencies, challenging both their failure to promptly pay her outstanding medical bills and their failure to reimburse her for her out-of-pocket payments made prior to being deemed eligible for Medicaid coverage.

In its final judgment, the district court required the state agencies to provide direct reimbursement to Levy for allowable services received during the statutory three-month retroactive-coverage period prior to her application for Medicaid.   The court imposed several limitations, however, on the direct reimbursement.  The state agencies now appeal the determination that they are required to provide direct reimbursement for allowable services received during the retroactive-coverage period.  Levy cross-appeals the limitations imposed by the district court on the direct reimbursements.

For the reasons set forth below, we **AFFIRM** the judgment of the district court with respect to the requirement that the state provide direct reimbursement for the payment of allowable services received during the retroactive-coverage period, but **REVERSE** the judgment with respect to two of the limitations placed on these direct reimbursements.

## I. BACKGROUND

Medicaid is a joint federal–state program that provides health insurance for low-income individuals.  The program authorizes federal financial assistance to states that choose to reimburse certain medical expenses.  State participation in Medicaid is optional, but once a state chooses to participate, it must adopt a plan that conforms to the requirements set forth in the Medicaid Act, *see* 42 U.S.C. § 1396, and its implementing regulations.  Michigan's Medicaid program has been approved by the Centers for Medicare & Medicaid Services (CMS), the agency responsible for administering the program at the federal level and for assuring that states operate their programs in accordance with the approved guidelines.

Levy applied for Medicaid to cover emergency hospitalization and medical bills in October of 1992.  Her application was initially denied, but in December of 1995 the Saginaw County Circuit Court determined that Levy was eligible for Medicaid benefits for the period from August 1 to December 31, 1992.  Between the initial denial of her application and the time that she was declared eligible for benefits, Levy paid over $8,000 to cover some of the medical bills incurred during the retroactive-coverage period, but the bulk of her bills incurred during that time period—totaling more than $40,000—remain unpaid.

Levy filed suit in November of 1996 against the officials in charge of the Department of Community Health and the Family Independence Agency, the state agencies that administer Michigan's Medicaid program.  She challenged both the officials' failure to promptly pay her outstanding medical bills and their failure to reimburse her for her out-of-pocket expenditures made prior to being deemed eligible for Medicaid coverage.

In March of 2000, the district court held that otherwise-eligible Medicaid recipients were entitled to direct reimbursement for out-of-pocket payments made for Medicaid-covered services provided during the retroactive-coverage period. But the court deferred a ruling on Levy's motion for summary judgment regarding the expenses that she incurred during this period because it was uncertain whether she was otherwise eligible for Medicaid at the time she made her payments. It also declined to rule on the issue of whether the defendants had provided reasonably prompt assistance, requesting instead that the parties submit supplemental briefs addressing the applicable standard of care.

In September of 2003, after Levy had satisfied the district court of her Medicaid eligibility, the court issued its final judgment, which required the defendants to provide direct reimbursement to Levy for covered services received during the three-month retroactive-coverage period prior to her application for Medicaid. The district court, however, also imposed several limitations on the direct reimbursement. Specifically, the court required that the medical bills must have been paid by the recipient (rather than by a third party) in order to be reimburseable. The court also determined that the reimbursement could be reduced by the amount that the out-of-pocket payments had depleted the recipient's assets in order to qualify for Medicaid. Finally, the district court may have limited reimbursement to the amount that Medicaid pays to participating providers, which is typically much lower than the rate paid by private individuals out-of-pocket, although the parties disagree as to whether the district court actually imposed this restriction.

The defendants now appeal the determination that they are required to provide direct reimbursement to Levy for allowable services received during the retroactive-coverage period. Levy cross-appeals the limitations imposed by the district court on the direct reimbursements. The claims for prompt payment of her medical bills are not at issue in this appeal.

## II. ANALYSIS

### A.    Standard of review

This court reviews a district court's grant of summary judgment de novo. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629 (6th Cir. 2002). Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.    Direct reimbursement

Pursuant to the Medicaid Act, Michigan's program must provide medical assistance to categorically and medically needy individuals. 42 U.S.C. § 1396a(a)(10). The categorically needy are those who are eligible for cash assistance because their income falls below a specific amount, § 1396a(a)(10)(A), whereas the medically needy are those who have higher income levels but are still unable to pay for all of their medical needs, § 1396a(a)(10)(C). Under the Act, states must provide comparable medical assistance to all Medicaid recipients within each classification, so long as the medically needy do not receive greater benefits than the categorically needy (although the reverse is permitted). § 1396a(a)(10)(B).

The Act defines "medical assistance" as "payment of part or all of the cost of the [covered] care and services . . . for individuals." § 1396d(a). It requires states to make medical assistance available for covered services provided to Medicaid recipients within the three months prior to the month in which the recipient applied for Medicaid (known as the retroactive-coverage period),

provided that the recipient would have been eligible for Medicaid at the time the services were rendered.  § 1396a(a)(34).

Levy, who qualifies for Medicaid because she is medically needy, alleges that she paid more than $8,000 to her medical providers in the course of her efforts to obtain Medicaid coverage.  She contends that the statutory regime requiring the states to cover services provided during the retroactive-coverage period obligates Michigan's Medicaid program to reimburse her for the amount she paid out-of-pocket.  Michigan's failure to reimburse her, Levy  argues, violates her right to medical assistance comparable to that received by medically needy individuals who do not pay their medical bills before Medicaid eligibility is established.  *See* § 1396a(a)(10) ("[T]he medical assistance made available to any individual [covered by Medicaid] . . . shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual [within the same classification]."); 42 C.F.R. § 440.240(b) ("The plan must provide that the services available to any individual in [a covered medically needy group] are equal in amount, duration, and scope for all recipients within the group.").

But Michigan argues that, as a vendor-payment system, Medicaid makes payments to providers, not to recipients.  Vendors participating in the Medicaid program agree to accept reimbursement from state Medicaid agencies at a rate significantly lower than the market rate in consideration of the certainty of receiving payment.  The states are permitted to make payments to individual beneficiaries only in limited circumstances.  Specifically, the states have the option of making direct payments to medically needy recipients for services provided by physicians and dentists, § 1396d(a), but Michigan has not elected to exercise that option.  (Individual beneficiaries who are categorically needy are not eligible for direct payments at all.)

Participating states are also allowed to directly reimburse individuals who make out-of-pocket payments for covered services if a state Medicaid agency improperly denies an individual's application for coverage.  42 C.F.R. § 431.246.  Underlying this exception is the desire to correct the inequitable consequences of an erroneous denial of eligibility.  At issue in this appeal is whether Levy is entitled to reimbursement for medical expenses incurred during the retroactive-coverage period before she applied for Medicaid.  The district court granted summary judgment for Levy on the separate question of whether she was entitled to "corrective payments" under 42 C.F.R. § 431.246 for expenses incurred after her application was filed.  That decision is not at issue in this appeal.

Courts that have considered whether medical bills incurred during the retroactive-coverage period are directly reimbursable to Medicaid recipients have found that payment is required.  In *Blanchard v. Forrest*, 71 F.3d 1163 (5th Cir. 1996), for example, the Fifth Circuit analyzed Louisiana's Medicaid program, which permitted direct reimbursement for expenses incurred during the retroactive-coverage period and initially paid out-of-pocket by the applicant, but only in instances in which the medical provider voluntarily refunded the applicant's payment and then submitted a claim evidencing the refund to the state Medicaid agency.  The court noted that, because Medicaid rates are much lower than those charged to private patients, Medicaid providers in Louisiana have no incentive to initiate voluntary refunds to patients determined to be Medicaid-eligible after the services are rendered.  *Id.* at 1167.

Under the Louisiana program, Medicaid applicants who failed to pay for services rendered during the retroactive-coverage period received a greater level of financial assistance than those who privately paid for the services.  The *Blanchard* court therefore concluded that Louisiana's program violated the statutory requirement that Medicaid coverage during this period should be just as effective as if the applicant had already been certified for coverage.  *Id.*  Even though the state agency had informed applicants in advance that they could not obtain retroactive assistance unless any advance payments were refunded by their providers, the court held that "the voluntary refund

policy still fails to make available and effective medical assistance to all Medicaid applicants for supplies and services furnished during the retroactive-coverage period, as required by [§] 1396a(a)(34)." *Id.* at 1168.

> Moreover, in a recent case with similar facts, the California Court of Appeals noted that
>
> > [e]very case brought to our attention in which the court was presented with an application for relief by a Medicaid recipient who had not received voluntary reimbursement for covered services obtained during the retroactivity period has provided relief. In some cases, the court has ordered the state agency to make reimbursement directly to the recipient. . . . Other cases have indicated that a state may also satisfy the comparability requirement by making reimbursement by the provider obligatory rather than voluntary.

*Conlan v. Bonta*, 102 Cal. App. 4th 745, 754 (2002) (holding that California's Medicaid program had failed to establish a process to ensure that recipients who had made out-of-pocket payments during the retroactive-coverage period were properly reimbursed). *See also Krieger v. Krauskopf*, 121 A.D.2d 448 (N.Y.S.Ct. 1986), *aff'd without opinion,* 512 N.E.2d 540 (N.Y. 1987) (holding that the petitioner was entitled to reimbursement for medical services covered by Medicaid that were received and paid for by the petitioner during the three-month period preceding the submission of her application). The decision of the district court below is therefore consistent with numerous federal and state court decisions that have previously addressed this issue.

In an attempt to distinguish the cases cited by Levy, the defendants point out that she tendered her payments not during the three-month time period in which she received medical treatment, but during the period between the initial rejection of her application and its eventual acceptance on appeal. They argue that, to the extent direct reimbursement to recipients is appropriate, the purpose of the reimbursements is to protect individuals who make out-of-pocket payments for their care when they are either unaware of the Medicaid requirements or unable to apply for coverage. But after an application has been submitted, that purpose is no longer relevant because applicants are informed in a publication titled "Facts About Medicaid" that payments made directly to providers cannot be reimbursed. Levy's case is therefore arguably different from the cited cases in which the individuals paid for the services they received before applying for Medicaid coverage.

The district court found this reasoning unpersuasive. It concluded that the governing statutes and regulations do not require that payments be made prior to application in order to be reimbursable. Instead, the court determined that direct reimbursement is required where the following three conditions are met: (1) medical services were furnished during the three months prior to the recipient's application; (2) the services provided were covered under Medicaid; and (3) the recipient was eligible for Medicaid at the time the services were furnished. The court declined to find that the time of payment was dispositive. This reasoning is consistent with that of the Fifth Circuit in *Blanchard*, which held that notification to recipients that they would not be directly reimbursed absent a voluntary refund from their provider did not negate the fact that the policy itself violated the comparability requirement of the Medicaid Act. 71 F.3d at 1167. Thus, even though Levy may have been informed at the time of her application that she would not be reimbursed directly, Michigan's refusal to reimburse her out-of-pocket expenses nevertheless violates her right to be treated in the same manner as all other medically needy Medicaid recipients in Michigan.

We agree with the reasoning of both the district court and the Fifth Circuit. Direct reimbursement to Medicaid recipients who have paid out-of-pocket for medical services provided during the three-month period prior to their application for Medicaid is appropriate where, as here, the recipients were rejected for Medicaid coverage in the first instance. In Levy's case, for example,

the process of establishing her eligibility took over three years.  She in effect had no choice but to pay her providers at least in part during this period of time in order to continue receiving medical care.  To then deny her reimbursement for expenses that would have been timely paid by Medicaid if her application had been initially accepted strikes us as inequitable, to say nothing of the state agencies' obligation to comply with the Medicaid Act's comparability requirement.

Reimbursement to Levy is also consistent with CMS's policy of making "direct reimbursement available to all individuals who pay for medical services between the date of an erroneous determination of ineligibility for Medicaid and the date that the determination is reversed."  State Medicaid Manual § 6320.  *See also* 42 C.F.R. § 431.246 (providing for corrective payments in the event of an incorrect denial of coverage, retroactive to the date the action was taken).  The State Medicaid Manual provides that "[s]tates may make direct reimbursement to individuals who paid for covered services after an erroneous determination of ineligibility that is reversed on appeal.  The purpose of this exception to the vendor payment principle is to correct the inequitable situation that results from an erroneous determination made by the agency." § 6320.2.  In *Greenstein v. Bane*, 833 F. Supp. 1054, 1069 (S.D.N.Y. 1993), the court held that 42 C.F.R. § 431.246 created an exception to Medicaid's vendor-payment regime because "[w]hen Medicaid needs to make corrective action, the provider has already been paid; it is only the recipient who requires reimbursement. . . . [I]f corrective payments were not made directly to the recipient, there would be no guarantee that he or she would actually be reimbursed for their [sic] payments."  By grafting the logic underlying the corrective-payment principle onto *Blanchard*, *Conlan*, and *Krieger*, we are extending the holdings of these cases to cover reimbursement for payments made *after* the retroactive-coverage period, even though the services were provided *during* that period.

We wish to emphasize, however, the narrow scope of our holding.  Levy's initial application for Medicaid was denied.  Had she been accepted into the program from the outset, she would never have been in a position where she felt the need to make payments for the medical services she received, because all of her care would have been covered by Medicaid.  Our holding is therefore limited to Medicaid recipients who, like Levy, had their applications rejected when they first applied for Medicaid coverage and then were successful in having that adverse ruling overturned on appeal.  We are not deciding whether an individual whose application is initially accepted but who nevertheless makes payments for medical care provided during the retroactive-coverage period is entitled to direct reimbursement.

As a final point on this issue, we find persuasive Levy's argument that the law as interpreted by the defendants leads to an unjust result.  If direct reimbursement were unavailable to Medicaid recipients who had paid out-of-pocket for services provided during the retroactive-coverage period, then individuals who make a good-faith effort to pay by spending their scarce resources, incurring debt, or forfeiting other basic necessities to pay for needed care would not receive coverage except in the unlikely event that their medical providers choose to give them a refund and then seek payment from the state Medicaid program.  Those individuals, on the other hand, who are able to obtain medical care without paying for it would receive complete coverage for the services provided.  Interpreting the statute as the defendants suggest would therefore reward those who make no effort to pay for their own care and penalize those who do.

## C.      Limitations on direct reimbursements

### *1.      The requirement that medical expenses be paid by the recipient*

The district court determined that direct reimbursement for medical expenses paid for care rendered during the retroactive-coverage period is available only if the charges were personally paid by the recipient.  According to the court, the direct reimbursement must be reduced by the amount of any third-party payments made on the recipient's behalf.  Such third-party payments include those

made by family members, friends, and charitable organizations, as well as by those entities legally obligated to pay for the recipient's care.

Medicaid is essentially a "payer of last resort," which means that it will not pay medical bills for which other parties are legally liable. *N.Y. Dept. of Soc. Serv. v. Bowen*, 846 F.2d 129, 133 (2d Cir. 1988). It is, therefore, not obligated to reimburse recipients for medical bills paid by private insurers, Medicare, workers' compensation carriers, or parties liable as the result of personal injury claims. *See id.* But family members, friends, and charitable organizations have no legal obligation to pay for the medical needs of the poor and may expect to be repaid for their generosity in helping an individual receive needed medical care. *See Greenstein v. Bane*, 833 F. Supp. 1054, 1063-64 (S.D.N.Y. 1993) (finding direct reimbursement appropriate for plaintiffs who had relied on charitable organizations or family members to pay their medical bills); *see also Cohen v. Quern*, 608 F. Supp. 1324, 1329-30 (N.D. Ill. 1984) (drawing a distinction between an unobligated party who voluntarily pays a Medicaid recipient's bill and a third party who is legally obligated to make such payments for the purpose of determining the recipient's eligibility for Medicaid). The analysis of this issue in the above cases strikes us as well-reasoned. We therefore hold that the district court erred in not allowing reimbursement for medical bills paid by entities not legally obligated to make the payment.

### 2.      *The requirement that reimbursements be reduced by the amount that the payments allowed the recipient to become eligible for Medicaid coverage*

The district court also allowed the defendants to deduct from direct reimbursements to individual recipients the amount of any "assets reduced by the payment of medical expenses by the recipient and/or Medicaid group member in order to establish asset eligibility." Without such a limitation, recipients who lawfully dispose of assets by making payments for medical services to establish their financial eligibility for Medicaid would reap a windfall by later being reimbursed for their formerly excess assets.

This concept can best be illustrated with the following example: Suppose that an individual's countable assets must be less than $2,000 to qualify for Medicaid. Someone with $2,500 in assets would obviously not qualify. But if that person paid $750 to satisfy an outstanding bill for medical care provided during the previous three months and then promptly applied for Medicaid, his or her remaining assets of $1,750 would be low enough to establish Medicaid eligibility. If that person, now a Medicaid recipient, were then reimbursed $750 for the payments made during the retroactive-coverage period, he or she would recoup all of the assets disposed of to qualify for Medicaid in the first place. The $750 reimbursement would thus result in a $500 windfall for the individual. Instead, reimbursement should be limited to $250, the amount that the individual paid out-of-pocket after spending down his or her assets to establish eligibility.

As the above example demonstrates, the avoidance of a windfall to Medicaid applicants is an appropriate consideration to take into account. We therefore conclude that the district court did not err in placing this limitation on the reimbursements.

### 3.      *The requirement that reimbursements be limited to the Medicaid rate*

The parties disagree as to whether the district court further ruled that reimbursements should be available only at the Medicaid-payment rate, which is typically much lower than the rates charged to private-pay patients. This ambiguity is due to an inconsistency in the language of the judgment issued by the district court below. With respect to the "corrective-action" reimbursements (not at issue in this appeal), the judgment reads: "Reimbursement shall be for the recipient's *out-of-pocket* expenses . . . ." (Emphasis added.) But with respect to the issue of direct reimbursement for charges incurred during the retroactive-coverage period, the judgment reads:

> Defendants shall reimburse payment for covered services received by the recipient in one or more of the three months prior to the recipient's Medicaid application ("retroactive period"), which were paid by the recipient who is eligible for Medicaid at the time the services were furnished.

The parties disagree as to the significance of the district court's failure to explicitly state that direct reimbursement for payment for services provided during the retroactive-coverage period should be for out-of-pocket expenses, as it did in reference to the corrective-action reimbursements. Levy essentially argues that the court's failure to do so was simply an oversight, but the defendants contend that it was an indication that reimbursement was to be limited to the Medicaid rate. If in fact the court imposed such a restriction, however, we conclude that it erred in doing so.

On first impression, permitting reimbursement at the reduced Medicaid rate seems to provide a reasonable compromise to a complicated situation. Given that the medical services have been rendered and the provider already compensated, either the Medicaid recipient or the state Medicaid agency will unfortunately be forced to bear the differential cost. The recipient, who had to make payments in order to receive continuing care after being initially denied Medicaid coverage, will lose the money paid for the care if not reimbursed. Conversely, the state agency, which eventually accepted the recipient into the program, will lose if it is forced to pay at a rate higher than the Medicaid rate. Allowing reimbursement at the Medicaid rate is essentially a way of splitting the baby. The state agency would be in the same position that it would have been in had it paid the provider directly, whereas the recipient, while still not fully reimbursed, would recoup at least some of the money spent for medical care.

Two courts have in fact endorsed this compromise. One is the Supreme Court of Wisconsin, which held in *Keup v. Wisconsin Department of Health and Family Services*, 675 N.W.2d 755 (Wis. 2004), that private-pay patients who are later found to be eligible for Medicaid are not entitled to be reimbursed by the provider for the amount paid out-of-pocket in excess of the Medicaid rate. The *Keup* court reasoned that because the plaintiff was neither a Medicaid applicant nor a recipient at the time she received treatment, the providers were entitled to charge her at their private-pay rate so long as she had notice of the applicable rate. 675 N.W.2d at 766. Similarly, the Court of Appeals of New York noted that "[t]he intent of the retroactive reimbursement provision of the federal statute is to provide financial assistance to those individuals who were unaware of their Medicaid eligibility. Nowhere in this statute is it required that, in this situation, the State make these individuals whole." *Seittelman v. Sabol*, 697 N.E.2d 154, 158 (N.Y. 1998).

Although the rationale of the *Keup* and *Seittelman* courts has an initial appeal, it does not address the fact that all of the arguments that support permitting direct reimbursement in the first place also support reimbursement at the out-of-pocket rate. Singling out a group of recipients for partial payment and providing full reimbursement to others violates the comparability provision of the Medicaid Act in the same way that distinguishing between those who paid for their care and those whose bills remain unpaid violates the provision. Where some Medicaid recipients are forced to pay for a portion of their treatment out-of-pocket while others are required to pay nothing for their treatment, the recipients have not received medical assistance of equal value. *See Greenstein v. Bane*, 833 F. Supp. 1054, 1074 (S.D.N.Y. 1993)*; see also Conlan v. Bonta*, No. 987697, slip op. (Cal Cal. Super. Ct. March 3, 2004) (enforcing *Conlan v. Bonta*, 102 Cal. App. 4th 745, 754 (2002), which held that the Medicaid compliance plan must fully reimburse participants for their out-of-pocket expenses); *Kurnik v. Dept. of Health & Rehabilitative Servs.*, 661 So. 2d 914, 918 (Fl. Ct. App. 1995) (holding that the plaintiffs were "entitled to be made whole for out-of-pocket expenditures made before eligibility is determined").

The Medicaid program, like all public benefit programs, requires a careful balancing of costs and benefits. *Seittelman*, 697 N.E.2d at 159. Both the financial integrity of the program and the

needs of individual recipients must be considered.  Failure to reimburse recipients for all of their expenses, however, shifts the burden of spiraling health care costs onto those who can least afford it, which is inconsistent with the very purpose of the Medicaid program.  *Keup*, 675 N.W.2d at 775 (Abrahamson, J., dissenting).  We therefore hold that direct reimbursements to those initially denied Medicaid coverage should not be limited to the Medicaid rate, but instead should be for the full out-of-pocket amount paid by the recipient.

If the state is unhappy with having to reimburse recipients at a rate higher than what it pays providers, it has the option of requiring that providers issue refunds to individuals who pay for services rendered during the retroactive-coverage period and then seek payment from Medicaid at the reduced rate.  *See* 42 C.F.R § 447.15 (requiring states to limit participation in Medicaid to providers who accept the Medicaid rate as payment in full); *see also Cohen*, 608 F. Supp. at 1330-32 (ordering providers to refund payments made by Medicaid recipients for services rendered during the retroactive-coverage period, but declining to order direct reimbursement because the state agency lacked the authority to issue payments to Medicaid recipients directly).  Because Michigan has not elected to pursue this avenue of reimbursement for recipients, its Medicaid program should fully reimburse recipients such as Levy for their out-of-pocket payments.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court with respect to the requirement that, in circumstances in which Medicaid recipients are initially denied Medicaid coverage, they must be reimbursed for out-of-pocket payments made for services provided during the retroactive-coverage period.  We also **AFFIRM** the judgment with respect to the requirement that reimbursements be reduced by the amount that the payments lowered the recipients' total assets to the level necessary to qualify for Medicaid.  Finally, we **REVERSE** the judgment with respect to the requirement that the medical expenses are not reimbursable unless paid by the recipient personally and the presumed requirement that reimbursements be made at the Medicaid rate.