[No. 33088-1-II.   Division Two.   March 7, 2006.]

VENETTA GASPER ET AL., *Respondents*, v. THE DEPARTMENT OF
SOCIAL AND HEALTH SERVICES, *Appellant*.

44

*Robert M. McKenna, Attorney General*, and *Michael M. Young, Donna T. Cobb*, and *William L. Williams, Assistants*, for appellant.

*Meagan J. MacKenzie* (of *Northwest Justice Project*) and *Amy L. Crewdson* (of *Columbia Legal Services*), for respondents.

¶1 PENOYAR, J. — The Department of Social and Health Services (DSHS) recently implemented the "shared living

rule,"[1] which reduces the number of home care hours it will fund for clients who live with their paid caregivers. DSHS believed this rule was consistent with the policies of not paying for services that benefit the entire household and of not paying for services that other support mechanisms already provide. Venetta Gasper and Tommye Myers, disabled Medicaid recipients living with their paid caregivers, challenged the reduction in their care hours. The trial court invalidated the shared living rule, finding it violated federal choice of provider and comparability requirements. Agreeing that the shared living rule violates federal comparability requirements, we affirm.

## FACTS

¶2 This case involves the legality of one provision in DSHS's Comprehensive Assessment Reporting Evaluation (CARE) assessment tool.[2] DSHS uses the CARE tool to evaluate the number of hours it will pay a caregiver to assist disabled clients in four different Medicaid programs. WAC 388-106-0050, -0055, -0070.

¶3 In a CARE evaluation, the evaluator scores the client on factors such as the client's ability to perform daily activities and the client's mental status. WAC 388-106-0085 through -0115. These numerical scores are put into a formula that calculates the client's "base" assistance level in hours of care. WAC 388-106-0080, -0125. If DSHS determines that informal supports like friends or family members are already helping the recipient meet certain needs, DSHS will apply a second formula to reduce the number of care hours for which the client qualifies. WAC 388-106--0130. The shared living rule at issue here automatically reduces the allowed care hours by approximately 15 percent

---

[1] WAC 388-106-0130(3)(b), formerly WAC 388-72A-0095 (2005).

[2] The Washington Administrative Code (WAC) provisions dealing with long-term care services were recently revised and renumbered. We will cite to the current WAC provisions, which are substantially the same as the provisions in place when Gasper and Myers were evaluated.

if the caregiver resides with the client. WAC 388-106--0130(3)(b).

¶4 DSHS implemented the shared living rule on the theory that live-in caregivers must clean their own houses, go shopping, and cook meals for their own benefit, and that the state should not pay for tasks that benefit the entire household. Through a study, DSHS determined that care-givers spend between 26 and 46 percent of their time on household tasks like cleaning and shopping. Citing RCW 74-.39A.005, DSHS claims the shared living rule furthers the legislative policy of not using public funds to displace a client's naturally occurring informal support.

¶5 Gasper and Myers live with their caregivers and receive Medicaid-funded home health care. Gasper is severely developmentally disabled and lives with Linda Green, an unrelated paid caregiver. Before the recent changes, Gasper was receiving funding for 184 hours of care per month. Under the CARE assessment, her base hours are 190 but are reduced to 152 through the shared living rule. Green states that she already spends more than 184 hours per month caring for Gasper and that she is unwill-ing to provide additional unpaid care. Green estimates she spends approximately 14 hours per week in extra cleanup and laundry for Gasper, beyond what she performs for herself and her family (Green's husband and teenage son also live in the house). She also estimates an extra 75 hours per month in food preparation time because Gasper's eating schedule and diet differ from the family's.

¶6 Myers is an elderly woman who lives with her dis-abled son Ricky, her son John, and John's wife. John is Myers's paid caregiver. Myers is diabetic and requires kidney dialysis three times per week. Under the previous assessment, she was receiving 184 hours of paid care. The CARE assessment set her base hours at 190, but reduced them to 153 after applying the shared living rule.

¶7 Like Green, John estimates that he spends more than 184 hours per month on his mother's care. In addition to the chores he performs for himself and his wife, John estimates

he spends an extra 8 hours per month shopping for his mother's special diet, 100 hours per month extra on housekeeping, and 45 hours per month extra on meal preparation.

¶8 Gasper and Myers challenge the shared living rule, asserting that it does not take into account the additional hours their caregivers provide that do not benefit the caregivers or the household in general. They claim their actual need for help with certain household tasks should have been evaluated and not automatically deemed met by their shared living situations.

¶9 DSHS claims that the shared living rule must be considered in the context of the entire CARE assessment. The assessment does not break down each task by hours needed to perform it but, rather, pays the caregiver for the extra time spent on household tasks for severely impaired persons by allotting more hours to those clients with more serious disabilities. DSHS argues that the shared living rule takes into account only that portion of the housework benefiting the entire household and that the caregivers are still being paid for work that benefits only the recipient.

¶10 Gasper and Myers requested hearings before administrative law judges (ALJs) to challenge the reductions in paid hours. The ALJs, who lacked the power to invalidate a department rule, affirmed the reduction. DSHS's Board of Appeals issued expedited decisions affirming the ALJs' decisions.

¶11 Gasper and Myers (hereafter Gasper) then filed actions in Thurston County Superior Court seeking both review of the administrative decisions and a declaratory judgment invalidating the shared living rule. The two cases were consolidated.

¶12 DSHS responded to both petitions. Appended to the response was the declaration of Penny Black, director of the Home and Community Services Division of the DSHS Aging and Disability Services Administration. Black explained the background and design of the CARE assessment tool

and, in particular, the shared living rule. The trial court granted Gasper's motion to strike Black's declaration, but it allowed DSHS to supplement the record with the rule making file relating to the adoption and implementation of the CARE assessment tool.

¶13 After hearing arguments, the trial court invalidated the shared living rule and reversed the two administrative decisions. Specifically, the trial court ruled that DSHS exceeded its statutory authority by violating federal choice of provider protections[3] and comparability requirements.[4]

## ANALYSIS

### I. Excluded declaration

¶14 Peggy Black's declaration explained the CARE assessment tool and DSHS's justification for the shared living rule. Excluding this declaration limited the record to the agency rule making file and the records from the parties' administrative proceedings. DSHS claims that the trial court abused its discretion by limiting the information it considered on review.

¶15 Under the Administrative Procedure Act, chapter 34.05 RCW, judicial review is limited to the agency record. RCW 34.05.558; *Motley-Motley, Inc. v. Pollution Control Hearings Bd.*, 127 Wn. App. 62, 76, 110 P.3d 812 (2005) (citing *Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n*, 110 Wn. App. 498, 518, 41 P.3d 1212 (2002), *aff'd*, 149 Wn.2d 17, 65 P.3d 319 (2003)), *review denied*, 156 Wn.2d 1004 (2006). A court may consider additional evidence only to resolve certain legal issues, not one of which is raised here. RCW 34.05.562(1).

¶16 The trial court has the discretion to limit its review to the administrative record before it. *Wash.*

---

[3] 42 U.S.C. § 1396a(a)(23) allows "any individual eligible for medical assistance [to] obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required."

[4] 42 U.S.C. § 1396a(a)(10)(B)(i) states that the medical assistance a state provides for any categorically needy individual "shall not be less in amount, duration, or scope" than the assistance provided to any other categorically needy individual.

*Indep. Tel.*, 110 Wn. App. at 518. A trial court abuses its discretion when its decision is manifestly unreasonable, is exercised on untenable grounds, or is based on untenable reasons. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 691, 101 P.3d 1 (2004).

¶17 In this case, the court struck Black's declaration but ordered that the rule making file, in its entirety, be admitted into the record. The rule making file is required to have all the information the agency gathered in formulating and adopting the rule. RCW 34.05.370; *Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n*, 148 Wn.2d 887, 906, 64 P.3d 606 (2003). The trial court had no obligation to supplement the administrative record. Because the trial court could presume that it had all relevant information in the record already through the rule making file, we hold that the trial court did not abuse its discretion by striking Black's declaration.

II. The Medicaid program

¶18 Medicaid is a program that provides medical assistance to financially needy individuals. *Rodriguez v. City of N.Y.*, 197 F.3d 611, 613 (2d Cir. 1999), *cert. denied*, 531 U.S. 864 (2000). Federal and state governments fund and run it jointly, with the federal government reimbursing the state for a portion of the state's expenditures. *Rodriguez*, 197 F.3d at 613; *Skandalis v. Rowe*, 14 F.3d 173, 174-75 (2d Cir. 1994). State participation in the program is optional. If a state chooses to participate, it must formulate a plan (state plan) that includes certain federally mandated forms of medical assistance, including nursing home care. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4); *Rodriguez*, 197 F.3d at 613.

¶19 States also have the option of providing in-home care services instead of nursing home care for those who would otherwise qualify for a nursing home. 42 U.S.C. § 1396n(c). In order to get federal reimbursement for this in-home care, states must receive a waiver from the Secretary of Health and Human Services (Secretary). 42 U.S.C.

§ 1396n(c)(1). This case involves these "waivered" Medicaid home care services.

## III. Standard of review for agency decisions

### A. Scope

■ ■ ¶20 Here we review an administrative rule's validity.

> In a proceeding involving review of a rule, the court shall declare the rule invalid only if it finds that: The rule violates constitutional provisions; the rule exceeds the statutory authority of the agency; the rule was adopted without compliance with statutory rule-making procedures; or the rule is arbitrary and capricious.

RCW 34.05.570(2)(c); *Devine v. Dep't of Licensing*, 126 Wn. App. 941, 956, 110 P.3d 237 (2005) (a rule that conflicts with a statute is beyond an agency's authority). In its conclusions of law, the trial court declared the shared living rule invalid because the agency exceeded its statutory authority by promulgating a rule that conflicted with federal law. Specifically, the trial court concluded as a matter of law that the rule violated "state and federal laws regarding freedom of choice of provider and comparability requirements." Clerk's Papers (CP) at 259. Because this is an issue of law, we review the trial court's conclusion de novo. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 880, 73 P.3d 369 (2003).

### B. Deference to agency determinations

■ ¶21 When a court reviews an agency's construction of a statute that the agency administers, the court must first ask whether Congress has directly spoken to the precise question at issue. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). If Congress's intent is clear, the court, as well as the agency, must give effect to Congress's unambiguously expressed intent. *Chevron*, 467 U.S. at 842-43; *Edelman v. State ex rel. Pub. Disclosure Comm'n*,

152 Wn.2d 584, 590, 99 P.3d 386 (2004). If, however, the court determines that Congress has not directly addressed the precise question at issue, and the statute is silent or ambiguous, the question for the court is whether the agency's answer is based on a permissible statutory construction. *Chevron*, 467 U.S. at 843.

¶22 Here, DSHS urges us to defer to its interpretation of the Medicaid statute because of its expertise in administering that law. Furthermore, DSHS argues that the provider choice and comparability provisions do not directly address the shared living rule, so we should defer to DSHS. Gasper argues that the provider choice and comparability provisions are not ambiguous and, therefore, no deference is warranted.

¶23 The comparability provision clearly demonstrates Congress's intent to provide comparable services to similarly situated recipients. 42 U.S.C. § 1396a(a)(10)(B); *Martin v. Taft*, 222 F. Supp. 2d 940, 977 (S.D. Ohio 2002) (finding the concepts of comparability and equality are neither vague nor ambiguous). The provider choice provision is equally straightforward and demonstrates Congress's intent to allow a recipient to choose a qualified and willing provider. 42 U.S.C. § 1396a(a)(23). Therefore, we need not defer to DSHS's interpretations of these two provisions.

## IV. Comparability

¶24 Analyzing whether the shared living rule meets federal comparability requirements entails a factual inquiry as well as a legal inquiry. *Martin*, 222 F. Supp. 2d at 977. The trial court's finding of facts determined:

2.3 The Department automatically reduces by 15% the personal care hours of recipients who live with their paid care providers. An automatic reduction is also applied to recipients who live in the same household as another recipient.

2.4 This shared living reduction is applied regardless of whether a recipient's needs for assistance with meal

preparation, housekeeping, shopping, and wood supply are actually met by the shared living situation.

2.5 The shared living reduction is not applied to recipients who live with someone other than the recipient's paid care provider or another recipient. . . .

2.8 Petitioners' needs for assistance with housekeeping, shopping and meal preparation are not fully met by their shared living situation.

CP at 258.

¶25 We review findings of fact under a substantial evidence standard, which is a quantum of evidence sufficient to persuade a rational, fair-minded person the finding is true. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). DSHS assigned error to each of these findings. It disputes the findings by attempting to demonstrate that recipients with live-in caregivers will always have certain needs met.

¶26 Based on a fair reading of chapter 388-106 WAC and the administrative records for Gasper, we hold that substantial evidence supports the trial court's findings of fact.

¶27 The trial court found that the shared living rule violates Medicaid's "comparability" requirement. CP at 259. That requirement states that the medical assistance a state provides for any categorically-needy individual "shall not be less in amount, duration, or scope" than the assistance provided to any other categorically needy individual. 42 U.S.C. § 1396a(a)(10)(B)(i).

¶28 The comparability requirement grew out of Congress's concern about previous disparities in servicing the medical needs of various needy groups. *Schweiker v. Hogan*, 457 U.S. 569, 573 n.6, 102 S. Ct. 2597, 73 L. Ed. 2d 227 (1982). For example, Congress wanted the amount, duration, and scope of assistance provided to an individual receiving assistance for the aged to be the same as the amount, duration, and scope of benefits provided to an individual receiving assistance for the blind. *Schweiker*, 457 U.S. at 573 n.6.

¶29 Courts have found that states violated the comparability requirement when they treated some recipients differently from other recipients with a similar level of need. *Schott v. Olszewski*, 401 F.3d 682, 688-89 (6th Cir. 2005) (finding treatment was not comparable when Medicaid did not reimburse recipient for medical expenses she paid out of pocket after she was wrongfully denied coverage); *White v. Beal*, 555 F.2d 1146, 1151-52 (3d Cir. 1977) (finding statute was illegal when it covered eyeglasses for those suffering from eye diseases but did not cover glasses for patients when refractive error caused poor eyesight).

¶30 Because Medicaid's overarching purpose is to provide for an individual recipient's needs, the comparability provision requires comparable services when individuals have comparable needs. *See* 42 U.S.C. § 1396a(a)(10). The question in this case is whether Gasper was offered the same amount of medical assistance available to "any other such individual." 42 U.S.C. § 1396a(a)(10)(B).

¶31 DSHS may use a reasonable method (such as the CARE assessment program) to determine a recipient's true need. This process is entirely consistent with the Medicaid program's purposes. However, DSHS violates the comparability requirement if it reduces a recipient's benefits based on a consideration other than the recipient's actual need. *White*, 555 F.2d at 1151. Having a live-in provider certainly may affect a recipient's need. Providers will do things for themselves that reduce the needs of their clients (such as clean the house). However, to simply impose an automatic 15 percent reduction for all recipients ignores the realities of their individual situations.

¶32 Clearly, each household differs in both the total number of hours spent on chores and in each household member's ability to do the work. However, without an evaluation to determine which needs live-in providers meet when they work on their own behalf, DSHS has created a system in which recipients like Gasper will have certain needs unmet, while others with comparable disabilities will

receive adequate services. Therefore, the shared living rule as applied here violates the comparability requirement.

## V. Waiver of the comparability requirement

¶33 We next consider DSHS's argument that it obtained a waiver of the comparability requirement.

### A. Medicaid waiver rules

¶34 In order to obtain any reimbursement for home health care services, a state must apply for a waiver from the Secretary under 42 U.S.C. § 1396n(c); *McMillan v. McCrimon*, 807 F. Supp. 475, 481 (C.D. Ill. 1992). State participation in the section 1396n(c) waiver program is entirely voluntary. *Skandalis*, 14 F.3d at 181. Unlike the Medicaid program itself, which requires participating states to provide certain services to all categorically needy individuals, the waiver program expressly allows states to request a waiver of the "comparability" requirement so that individuals within the program may receive varying levels of service. 42 U.S.C. § 1396n(c)(3), (c)(10); *Skandalis*, 14 F.3d at 181.

¶35 Under these provisions, states may target patients in a waiver class defined by a specific illness or by other circumstances. *See Skandalis*, 14 F.3d at 183 (upholding a state waiver plan that provided home care only to the categorically needy); *Beckwith v. Kizer*, 912 F.2d 1139, 1140 (9th Cir. 1990) (upholding a waiver program targeting those hospitalized for more than 90 days). Defining a waiver class sometimes involves difficult policy judgments concerning where services would be used most efficiently. *Beckwith*, 912 F.2d at 1141.

### B. DSHS's waiver application

¶36 DSHS claims that, in its waiver application to the Secretary, it specifically requested a waiver of the Medicaid Act's comparability requirement. In applying for the waiver, DSHS used a boilerplate application form available through the Center for Medicare and Medicaid Services

(CMS).[5] The boilerplate form does indeed contain standardized language about waiving comparability requirements. CENTERS FOR MEDICARE & MEDICAID SERVICES, SECTION 1915(c) HOME AND COMMUNITY-BASED SERVICES WAIVER APPLICATION (version 06-95) at 4.

¶37 However, the boilerplate language waiving comparability does not give states complete freedom to provide different services to different people. States still must describe the waiver class by defining the target groups that will receive services under the waiver. *Skandalis*, 14 F.3d at 181; 42 C.F.R. § 441.301(b)(3).

¶38 According to the statutory language, the Secretary, not the state, grants the waiver. 42 U.S.C. § 1396n(c)(1),[6] (c)(3).[7] Without showing that it somehow incorporated the shared living rule into its waiver request, DSHS cannot claim that the Secretary waived the comparability requirements for those who live with their caregivers. *See Skandalis*, 14 F.3d at 176; *Beckwith*, 912 F.2d at 1141 (upholding states' limits on services under the waiver where the states had described in the waiver how they intended to limit services).

## C. CMS approval

¶39 DSHS claims that CMS authorized the shared living rule because CMS authorized its Medicaid plan. Gasper claims that CMS was not aware of the shared living rule because the rule was not described in any materials given to it. Furthermore, Gasper claims that CMS does not have the authority to waive federal Medicaid laws.

---

[5] CMS is the federal agency that administers the Medicare program and works with the states to administer Medicaid. It approves Medicaid waivers and State Medicaid Plans.

[6] "The Secretary may by waiver provide that a State plan approved under this subchapter may include as 'medical assistance' under such plan payment for part or all of the cost of home or community-based services." 42 U.S.C. § 1396n(c)(1).

[7] "A waiver granted under this subsection may include a waiver of the requirements of section 1396a(a)(1) of this title (relating to statewideness), section 1396a(a)(10)(B) of this title (relating to comparability), and section 1396a(a)(10)-(C)(i)(III) of this title (relating to income and resource rules applicable in the community)." 42 U.S.C. § 1396n(c)(3).

¶40 There is no proof that a specific waiver was sought or obtained so that varying levels of service could be given under the shared living rule. A general waiver of the comparability requirement does not suffice.

VI. Provider choice

¶41 Even though we have determined that the shared living rule is invalid, DSHS may nonetheless reduce the care hours of those who live with their paid caregivers *after* it has found that a client's needs are actually met through his or her shared living situation. Because the issue of provider choice could still arise in this context, we address it below.

¶42 The federal Medicaid Act says that a state plan must:

> provide that (A) any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services.

42 U.S.C. § 1396a(a)(23).

¶43 Gasper claims state law also guarantees provider choice under RCW 74.39A.270(4), which states, "Consumers and prospective consumers retain the right to select, hire, supervise the work of, and terminate any individual provider providing services to them." However, this section does not create an independent choice of provider rule that is different from federal law.

¶44 Gasper argues that the shared living rule interferes with her right to choose a provider because her benefit reduction was based solely on her choice of provider, i.e., Gasper must choose someone other than her preferred provider in order to obtain the level of service she needs.

¶45 Medicaid recipients do not have an absolute right to receive continued service from their preferred providers. *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 785, 100 S. Ct. 2467, 65 L. Ed. 2d 506 (1980). For

example, recipients cannot claim a state has violated their right to the provider of choice when providers refuse or discontinue service because of low rates. *Antrican v. Buell*, 158 F. Supp. 2d 663, 671 (E.D.N.C. 2001), *aff'd*, 290 F.3d 178 (4th Cir. 2002).

¶46 Furthermore, forcing a recipient to change caregivers or to physically relocate when the current care provider is no longer willing or qualified does not violate the choice of provider rules. *O'Bannon*, 447 U.S. at 785; *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 178 (2d Cir. 1991). Therefore, although the shared living rule violates comparability requirements, it does not violate the choice of provider rules. No provider or recipient may demand additional hours or greater pay than DSHS guidelines allow. *Antrican*, 158 F. Supp. 2d at 671.

VII. Attorney fees

¶47 Gasper requests attorney fees on appeal under RCW 74.08.080(3).[8] Because she prevails, we grant her request upon compliance with RAP 18.1.

¶48 Affirmed.

VAN DEREN, A.C.J., and BRIDGEWATER, J., concur.

Review granted at 157 Wn.2d 1017 (2006).

---

[8] RCW 74.08.080(3) states: "When a person files a petition for judicial review . . . of an adjudicative order entered in a public assistance program, no filing fee shall be collected . . . . In the event that the superior court, the court of appeals, or the supreme court renders a decision in favor of the appellant, said appellant shall be entitled to reasonable attorneys' fees and costs."