[No. A106278. First Dist., Div. Three. Aug. 15, 2005.]

KEVIN CONLAN et al., Plaintiffs and Respondents, v.
SANDRA SHEWRY, as Director, etc., et al., Defendants and Appellants.

## Counsel

Bill Lockyer, Attorney General, Douglas M. Press, Thomas R. Yanger, Teresa L. Stinson and Elizabeth Edwards, Deputy Attorneys General, for Defendants and Appellants.

Neighborhood Legal Services of Los Angeles County, Sonal Ambegaokar, Barbara K. Frankel; Bay Area Legal Aid, Michael D. Keys; Western Center On Law & Poverty, Richard A. Rothschild, Robert D. Newman, Catherine Murphy and Kimberly Lewis for Plaintiffs and Respondents.

Barbara Jones, Rochelle Bobroff and Michael Schuster for AARP as Amicus Curiae on behalf of Plaintiffs and Respondents.

## Opinion

**POLLAK, J.**—Nearly three years ago, this court interpreted state and federal law governing Medi-Cal, California's implementation of Medicaid, to require that beneficiaries receive reimbursement for covered medical expenses incurred during the three-month period before they apply for assistance (the retroactivity period). (*Conlan v. Bontá* (2002) 102 Cal.App.4th 745 [125 Cal.Rptr.2d 788] (*Conlan I*).) In order to comply with federal law, we held the California Department of Health Services (DHS or the Department) must provide a means by which those who incur covered expenses during the retroactivity period may either obtain reimbursement directly from the Department or compel their providers to obtain reimbursement on their behalf. (*Id.* at pp. 753–754.) Although acknowledging that "[t]he manner in which the Department chooses to meet its obligations is within the discretion of the Department," the trial court was directed to "issue a writ of mandate pursuant to Code of Civil Procedure section 1085 directing the Department to adopt and implement procedures consistent with this opinion to ensure that Medi-Cal recipients entitled to reimbursement for covered services obtained during the retroactivity period are promptly reimbursed." (*Conlan I, supra,* at p. 764.)

Almost three years have elapsed since *Conlan I* was decided. During this period, the Legislature has amended the governing statute to incorporate the substance and undoubtedly to facilitate the implementation of that decision. Yet, so far as the record now before this court indicates, to date the Department has not begun to implement the decision. To the contrary, the Department has resisted petitioners' efforts to enforce compliance, pleading poverty and reasserting contentions that were rejected in *Conlan I*. The trial court, displaying considerable patience over an extended course of hearings,

ultimately entertained a motion by the Department to approve a proposed plan and a notice that it intended to send to Medi-Cal recipients informing them of the new procedure. The trial court found the Department's plan, as best it could be understood, inadequate in several respects, and entered an order specifying changes in the notice required to comply with the decision in *Conlan I.* Rather than make those changes or seek immediate writ review, the Department chose to appeal from the nonappealable order, which has resulted in an additional year of delay. In the interest of avoiding further prolongation of these proceedings, we treat the appeal as a petition for a writ of mandate and review each of the rulings to which the Department objects. With two qualifications, we conclude the trial court properly interpreted *Conlan I* and provided appropriate amplification with respect to specifics that were not addressed in the original appeal.

BACKGROUND

*Statutory framework*

"Title XIX of the Social Security Act (42 U.S.C. §§ 1396–1396s), commonly known as Medicaid, is a cooperative federal-state program designed to provide medical assistance to individuals with insufficient income and resources to meet the costs of necessary medical care. (42 U.S.C. § 1396.) Medi-Cal is the state implementation of the federal Medicaid program, and is administered by the Department. (Welf. & Inst. Code,[1] §§ 10721, 14000 et seq.; Cal. Code Regs., tit. 22, § 50004.)" (*Armando D. v. State Dept. of Health Services* (2004) 124 Cal.App.4th 13, 16 [21 Cal.Rptr.3d 66].) States are not required to participate in Medicaid, but if a state does participate, it must comply with the federal statutes and regulations governing the programs. (*Wilder v. Virginia Hospital Assn.* (1990) 496 U.S. 498, 502 [110 L.Ed.2d 455, 110 S.Ct. 2510].)

"Among the many requirements of federal law, states that participate in Medicaid must provide qualifying individuals coverage for services received during the three months prior to applying for benefits if the individual was eligible for benefits during that period. (42 U.S.C. § 1396a(a)(34); 42 C.F.R. § 435.914 (2001).) This is called the 'retroactivity period.' For a variety of reasons, qualifying individuals often will obtain covered services during that 90-day period. If they pay for those services, they become entitled to prompt reimbursement once they receive their Medi-Cal card and are accepted into the program." (*Conlan I, supra,* 102 Cal.App.4th at p. 753.) Although not explicitly the focus of *Conlan I,* Medi-Cal beneficiaries are also

---

[1] Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code.

entitled to reimbursement of expenses incurred during the period between the submission and approval of their applications (the evaluation period). (§ 14019.3, subd. (a)(1).) The "comparability requirement" incorporated in the Medicaid program mandates that "the medical assistance made available to any individual . . . [¶] . . . shall not be less in amount, duration, or scope than the medical assistance made available to" any other individual. (42 U.S.C. § 1396a(a)(10)(B).)[2] This medical assistance includes "payment of part or all of the cost of the [covered] care and services . . . ." (42 U.S.C. § 1396d(a).)

Prior to *Conlan I*, section 14019.3 provided that Medi-Cal recipients who had paid for medical services for which coverage was available were entitled to reimbursement from their provider after the provider had been reimbursed by the state.[3] In the first appeal, the Department acknowledged that no means existed to compel a recalcitrant provider to seek reimbursement, but contended that the federal "vendor payment principle" prevented the Department from directly reimbursing beneficiaries. *Conlan I* rejected that contention, and section 14019.3 subsequently has been amended to explicitly authorize direct payments to beneficiaries.

---

[2] The omitted language in the ellipsis limits the scope of the comparability provision to individuals described in 42 United States Code section 1396a(a)(10)(A), i.e., persons qualifying for assistance under other federal programs who are referred to as the "categorically needy," as distinguished from the "medically needy." The latter "are persons who are unable to pay for medical expenses, but whose income is too large to qualify for aid under other federal financial assistance programs." (*Massachusetts Ass'n of Older Americans v. Sharp* (1st Cir. 1983) 700 F.2d 749, 750.) Pointing to this distinction for the first time, the Department questions this court's interpretation of the comparability provision. Not only does any argument based on the proper interpretation of 42 United States Code section 1396a(a)(10)(B) come too late (see *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 301 [253 Cal.Rptr. 97, 763 P.2d 948] [the " 'decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case' "]), but the distinction does not affect the issues in this litigation. Title 42 United States Code section 1396a(a)(10)(B) requires treating categorically needy Medi-Cal recipients no less favorably than any other recipient. The Department's failure to ensure reimbursement, as this court held in *Conlan I*, violates this requirement.

[3] When *Conlan I* was decided, section 14019.3 provided that "(a) A beneficiary or any person on behalf of the beneficiary who has paid for health care services otherwise covered by the Medi-Cal program received by the beneficiary shall be entitled to a return *from the provider* of any part of the payment which meets all of the following: [¶] (1) Was rendered during any period prior to the receipt of his or her Medi-Cal card, for which the card authorizes payment under Section 14018 or 14019. [¶] (2) Was reimbursed to the provider by the Medi-Cal program, following all audits and appeals to which the provider is entitled. [¶] (3) Is not payable by a third party under contractual or other legal entitlement. [¶] (4) Was not used to satisfy his or her paid or obligated liability for health care services or to establish eligibility. [¶] . . . [¶] (e) The provider shall return any and all payments made by the beneficiary . . . *upon receipt of Medi-Cal payment*." (Italics added.)

*Procedural history*

### A. Overview

Some months after the decision in *Conlan I* became final, petitioners again requested the trial court to issue a writ of mandamus ordering the Department to implement a system to provide prompt reimbursement to those who had incurred expenses for which they were entitled to reimbursement. The Department opposed that application, offering numerous reasons why it could not comply. Rather than simply issuing a writ in the terms specified in the opinion of this court, the trial court entertained the Department's objections and ultimately ordered the Department to submit a proposed plan that DHS considered sufficient to comply with the directive in *Conlan I*. Without objection, DHS submitted its proposed plan, a motion for its approval, and lengthy argument as to why further or faster compliance was impossible. At the hearing on that motion, the trial court refused to approve the proposed plan, but ordered the Department to submit a proposed notice to Medi-Cal beneficiaries to be sent out as soon as possible to advise those with potential claims of the need to save their receipts. The Department submitted a proposed form of notice predicated on the compliance plan that the court had rejected, accompanied by additional argument as to why it could not comply with the trial court's orders. On March 3, 2004, the trial court issued an order denying without prejudice approval of the Department's proposed notice, and setting out its determination of several issues concerning an acceptable compliance plan "intended to clarify the issues necessary to draft an accurate Notice." The Department purports to appeal from that order.

### B. Conlan I

As described more fully in the *Conlan I* opinion, this litigation arose originally from the denial of three requests for direct reimbursement. One petitioner, Asher Schwarzmer, sought payment directly from the Department after his provider diligently but unsuccessfully sought reimbursement from the Department on Schwarzmer's behalf of payments he had made during the retroactivity and evaluation periods. The second petitioner, Kevin Conlan, sought reimbursement directly from the Department after his provider refused to seek reimbursement of eligible payments made during the evaluation period. The third petitioner, Thomas Stevens, participated in the Health Insurance Premium Payment Medi-Cal Program (HIPP) and sought reimbursement from the Department for prescriptions he had purchased after being accepted into the Medi-Cal program. The Department denied all three petitions, and petitioners' fair hearing requests were dismissed by administrative law judges (ALJ's) on the ground they had no jurisdiction to order direct payment to a Medi-Cal recipient.

Petitioners then petitioned the superior court for writs of mandate under Code of Civil Procedure sections 1094.5 and 1085, seeking to overturn the dismissal of their fair hearing requests and for an order requiring the Department to establish a procedure by which Medi-Cal beneficiaries in similar circumstances can promptly obtain reimbursement of covered expenses incurred during the retroactivity period. The trial court denied the petitions but this court reversed, holding that whether section 14019.3 satisfies the comparability requirement "must be answered pragmatically. The issue is not whether the statute creates an abstract right on the part of the recipient to obtain reimbursement from the provider, but whether a process has been established that offers reasonable assurance that the right will be respected, and that needy recipients entitled to reimbursement will receive the amounts to which they are entitled in a timely manner. If the latter is not the case, those recipients who have paid for covered services during the retroactivity period will continue to receive less in benefits than those who did not advance payment, in violation of the comparability requirement." (*Conlan I, supra,* 102 Cal.App.4th at p. 756.) This court concluded that the practice in California failed to comply with federal requirements and remanded to the trial court for the issuance of writs of mandate pursuant to Code of Civil Procedure section 1094.5 and, as indicated above, pursuant to Code of Civil Procedure section 1085 "directing the Department to adopt and implement procedures consistent with this opinion to ensure that Medi-Cal recipients entitled to reimbursement for covered services obtained during the retroactivity period are promptly reimbursed." (*Conlan I, supra,* at p. 764.)

### C. *Post*-Conlan-I *proceedings*

*Conlan I* was filed on September 30, 2002. On March 14, 2003, petitioners returned to the trial court, contending that, despite the clear direction in *Conlan I*, "DHS has informed petitioners' counsel that it does not intend to change its policies in the foreseeable future to comply with the appellate court judgment but instead plans to continue administering Medi-Cal reimbursement claims pursuant to its existing procedures . . . ." Petitioners requested "a writ directing respondents to implement a process for reimbursing Medi-Cal recipients who are owed reimbursement for out-of-pocket costs that complies with the requirements of the Court of Appeal decision. Petitioners also seek an order directing DHS to reimburse their individual claims."

In opposing the motion for enforcement, the Department argued that petitioners were "improperly attempting to expand the scope of the appellate court's holding to include *all* Medi-Cal beneficiaries who incurred out-of-pocket expenses, not just those relating to the retroactivity period or to the HIPP co-payment issue." The Department asserted that it was attempting to develop and implement new procedures, but that "massive system changes

will be required," and that "many components of development and implementation . . . lie outside the Department's control and . . . will require considerable time to resolve." It argued that it would need additional personnel and funding to implement a direct reimbursement plan, which would require "approval from both the executive branch and the Legislature."

A hearing on petitioners' motion for enforcement was held on April 30, 2003, and on May 12, 2003, the superior court issued an "interim order" in which it directed the Department to file within 60 days "a written Compliance Plan (Plan) setting forth the actions they propose to take to achieve compliance with the Court of Appeal decision." On July 11, 2003, the Department filed a motion entitled "Motion to Approve the Compliance Plan of the California Department of Health Services." The Department submitted a proposed plan but argued that the petition for a writ of mandate was moot because DHS had settled the claims of the three individual petitioners; that it was "making good faith *efforts to formulate a plan to develop a new system* for Medi-Cal reimbursement"; that the court should not instruct the ALJ's to begin adjudicating reimbursement claims; and that "the lack of federal financial participation may limit the power of this court to implement the department's proposed compliance plan." (Italics added.)

The trial court held a hearing on November 18, 2003, at which the parties addressed the sufficiency of the proposed notice and the manner by which the Department would begin notifying beneficiaries of their right to reimbursement. The court suggested that notice be sent out with the next regularly scheduled quarterly notice to Medi-Cal beneficiaries.[4] The Department argued that it did not have the resources to add an additional notice to the mailing it was already planning to send, and that it did not have time to include notice in the next scheduled mailing

At that hearing, the parties also addressed several issues that were not addressed in *Conlan I*: the retroactivity of the decision; whether the procedure for reimbursement should encompass covered expenses incurred during the application period as well as the retroactivity period; whether beneficiaries should be reimbursed for services received from non-Medi-Cal providers; and whether beneficiaries should be reimbursed for their actual out-of-pocket expenses or only for their covered expenses at Medi-Cal approved rates. The court asked for additional briefing on these issues, and ordered the Department to submit a proposed form of notice to be sent to Medi-Cal beneficiaries.

---

[4] These notices are sent out pursuant to a consent decree in an action entitled *Jackson v. Rank* (E.D.Cal. June 9, 1986, Civ. A. S-83-1451 LKK) 1986 WL 747746. In that case, the parties agreed and the court ordered that "The Department . . . send a quarterly mailing to recipients advising them of their right to fair hearings to contest Department action on prior approvals, and informing them how to request such hearings."

After additional briefing and a hearing at which the parties addressed the content of the notice to be sent to beneficiaries, the Department submitted a revised notice. This notice provided that reimbursement was available only if the service was obtained from a Medi-Cal enrolled provider, the service was rendered during the retroactivity period or between the date of an erroneous denial of an application for benefits and the reversal of the denial, and the service was rendered on or after October 29, 2002. The final section of the notice provided that reimbursement from the Department was available only if "After you received your Medi-Cal card, you contacted your provider and showed your provider your Medi-Cal card and the provider would not give you your money back."

On March 3, 2004, the trial court issued an order in which it acknowledged the necessity of sending out notices promptly, but "also recognize[d] that the substance of the Notice must be accurate. Such accuracy mandates that the Court issue this order, then review the Notice once more before it is mailed." The court ordered that reimbursement be made available to "[e]very Medi-Cal recipient who received eligible medical services on or after June 27, 1997, the date this petition was filed . . . ," that reimbursement was required for services rendered during the evaluation period as well as during the retroactivity period, that covered services rendered by non-Medi-Cal providers were eligible for reimbursement at the full amount paid by the beneficiary, and that reimbursement is required even if a non-Medi-Cal provider fails to apply for temporary Medi-Cal participation. The court gave the Department until March 23, 2004 to file comments about the revised notice and scheduled a hearing for March 29, 2004.

In response, the Department sent the court a letter stating, "We are in receipt of a copy of the Court's order, filed March 3, 2004, denying the Department's motion to approve its Compliance Plan. [¶] We have decided to seek appellate review of the order. [¶] Accordingly, we wish to receive the benefit of the Court of Appeal's perspective on these central issues before we send out a further revised Notice." On April 7, 2004, the Department filed its notice of appeal.[5]

---

[5] Although entered subsequently, we note from the register of actions that on May 10, 2004, the trial court entered a further order directing that notice be mailed on June 15, 2004 "to all current Medi-Cal beneficiaries who as Heads of Households would have had said notice mailed to them if the Notice had been included with the June 2004 *Jackson v. Rank* mailing." The notice states that under a "new process [that] is not yet ready," those who "paid for health care services during the time you were eligible for Medi-Cal . . . may be able to get some of your money back," and advises beneficiaries to "save any receipts or other proof of payment for Medi-Cal covered health care services you paid or will pay for yourself or eligible family members." The order also provides that the Department "shall not purge those Medi-Cal records in existence on or after June 15, 2004, which are necessary for contacting Medi-Cal beneficiaries who were issued benefits commencing as early as June 1997."

DISCUSSION

## I. *Appealability*

■ "A reviewing court has jurisdiction over a direct appeal only when there is (1) an appealable order or (2) an appealable judgment." (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 696 [107 Cal.Rptr.2d 149, 23 P.3d 43]; see also Code Civ. Proc., § 904.1.) "A trial court's order is appealable when it is made so by statute." (*Griset, supra*, at p. 696.) "The theory is that piecemeal disposition and multiple appeals in a single action would be oppressive and costly, and that a review of intermediate rulings should await the final disposition of the case." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 58, p. 113.)

■ The order of March 3, 2004, from which this appeal is purportedly taken is not an appealable order. Contrary to the California Rules of Court, the Department's opening brief does not contain a statement "explain[ing] why the order appealed from is appealable." (Cal. Rules of Court, rule 14(a)(2)(B)) and its reply brief ignores the explanation in petitioners' brief as to why the order is not appealable. Ordinarily, this defect would be fatal and would require dismissal of the appeal for lack of jurisdiction. (See, e.g., *Jennings v. Marralle* (1994) 8 Cal.4th 121, 126 [32 Cal.Rptr.2d 275, 876 P.2d 1074].) However, a purported appeal from a nonappealable order may be treated by the appellate court as a petition for extraordinary relief. (See *Olson v. Cory* (1983) 35 Cal.3d 390, 400–401 [197 Cal.Rptr. 843, 673 P.2d 720].) Although such discretion should be exercised only in extraordinary circumstances, we agree with petitioners that this case presents an appropriate occasion.[6] It has been nearly three years since *Conlan I* was decided, and thanks in no small part to the additional time required to process this

---

The Department has filed an unopposed request that we take judicial notice of the record in the previous appeal in this matter, which is hereby granted. (Evid. Code, § 452, subd. (d).)

The Department also asks that we take judicial notice of the California State Auditor's December 2003 report entitled, "Department of Health Services: It Needs to Better Plan and Coordinate Its Medi-Cal Anti-Fraud Activities." The Department suggests that judicial notice is appropriate under Evidence Code section 452, subdivisions (c) and (h). The Department asserts that the report is an official act and that because it is available on the Internet the contents of that report are "not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." The request for judicial notice of the report is denied. Beyond the mere fact that the report exists, the availability of the report on the Internet hardly renders the content of the report "not reasonably subject to dispute." Although the report may well be an official act of the executive, the report was not brought to the attention of the trial court and there is not a single reference to the report in the appellate briefs of either party.

[6] At oral argument the Department joined in petitioners' request that this court treat the appeal as a writ petition.

inappropriate appeal, the Department's procedures remain out of compliance with the requirements of federal law. To dismiss the appeal would only further forestall compliance and delay reimbursement of covered health care expenses to those Medi-Cal recipients entitled to receive such reimbursement.

## II. *California law now provides for direct reimbursement to Medi-Cal recipients*

When this case was first before this court, the Department took the position that it was prohibited from providing direct reimbursement to Medi-Cal recipients because California law did not provide any exception to the "vendor payment principle." After issuance of the decision in *Conlan I* rejecting this contention, the Legislature amended section 14019.3. The statute now provides explicitly:[7]

"(a) A beneficiary or any person on behalf of a beneficiary who has paid for medically necessary health care services, otherwise covered by the Medi-Cal program, received by the beneficiary shall be entitled to a return from a provider *or directly from the department* of any part of the payment that meets all of the following:

"(1) Was rendered during *the 90-day* period prior to *application for, his or her Medi-Cal card, or after application for but* prior to the *issuance of,* his or her Medi-Cal card, for which the card authorizes payment . . . *or was charged to the beneficiary as excess copayment during the period after issuance of his or her Medi-Cal card.* [¶] . . . [¶]

"*(g) The department shall ensure payment to a beneficiary from a provider. A provider shall be notified in writing by the department when a beneficiary has submitted a claim to the department for reimbursement of services provided during the periods specified in paragraph (1) of subdivision (a). If a provider is not currently enrolled in the Medi-Cal program, the department shall assist in that enrollment. Enrollment in the Medi-Cal program may be made retroactive to the date the service was rendered.*

"*(h) If a provider fails or refuses to reimburse a beneficiary for services provided during the periods specified in paragraph (1) of subdivision (a), within 90 days of receipt by the department of a written request by a beneficiary or a representative of a beneficiary, the department may take enforcement action that may include, but shall not be limited to, any or all of the following:*

---

[7] The italicized portions are language that was added in 2002. Language that was deleted is not indicated.

*"(1) Withholding of future provider payments.*

*"(2) Suspension of a provider from participation in the Medi-Cal program.*

*"(3) Recoupment of funds from a provider.*

*"(i) If a provider fails or refuses to reimburse a beneficiary within 90 days after receipt by the department of a written request from a beneficiary or a representative of a beneficiary, the department shall directly reimburse a beneficiary for medically necessary health care expenses incurred during the periods specified in paragraph (1) of subdivision (a). The department shall reimburse a beneficiary only to the extent that federal financial participation is available and only when the claim meets all of the following criteria:*

*"(1) The service was a covered benefit under the Medi-Cal program.*

*"(2) The provider was an enrolled Medi-Cal provider at the time the service was rendered.*

*"(3) The service was ordered by a health care provider, within the scope of his or her practice.*

*"(4) The beneficiary is eligible for reimbursement . . . .*

*"(5) The reimbursement shall be the amount paid by the beneficiary, not to exceed the rate established for that service under the Medi-Cal program.*

*"(j) . . . [T]his section may be implemented by a provider bulletin or similar notification, without any further regulatory action."* (§ 14019.3.)

By these amendments, the Legislature clearly intended to embrace the decision in *Conlan I.* When the changes were proposed, they were described as "Conlan Lawsuit Changes: This bill makes statutory changes needed to comply with the *Conlan v. Bontá* decision. In this decision, the Appellate Court held that the state must establish a reasonable procedure by which recipients may obtain prompt reimbursement for covered services for which they paid during the three months prior to applying for Medi-Cal coverage. The court further found that the recipient should not be required to wait until the provider submits and is reimbursed for a claim for services rendered, before being reimbursed." (Sen. Rules Com., 3d reading analysis of Assem. Bill No. 1762 (2003–2004 Reg. Sess.) June 23, 2003, p. 8, underscoring omitted & italics added.) The description of the amendments recited that they would: "Require a Medi-Cal beneficiary be repaid by a provider or directly from DHS for co-payments paid for medically necessary services provided

within the 90 day period prior to the beneficiary's application for the Medi-Cal card. The beneficiary must also be repaid for co-payments made after the application, but prior to the issuance of the Medi-Cal card. A Medi-Cal beneficiary must be repaid if the person is charged an excess co-payment during the period after the issuance of the Medi-Cal card. DHS must ensure payment to beneficiary from the provider, if the provider refuses, DHS may withhold future funds from the provider, suspend the provider from participation in the program or recoup funds from the provider." (Sen. Conc. Amends. To Assem. Bill No. 1762 (2003–2004 Reg. Sess.) as amended July 27, 2003, pp. 5–6.)

## III. *The trial court's order*

Because of the unusual procedural posture, this case is now before this court to review the trial court's March 3, 2004 order regarding the sufficiency of the proposed notice to Medi-Cal recipients. Nevertheless, the Department's challenge to the trial court's order requires consideration of the substantive arguments the Department has advanced as to why it should not be required to comply with *Conlan I* as the trial court has construed this court's prior opinion and other applicable provisions of law not considered in *Conlan I*.

The trial court's order explicitly addressed five questions concerning compliance with *Conlan I*: "1. Who should receive the Notice?" "2. Should *Conlan* be applied retroactively?" "3. Should covered services provided during the 'evaluation period' be covered?" "4. Will covered services rendered by non-Medi-Cal providers be eligible for reimbursement?" "5. [Whether] [f]ull reimbursement is required." Before considering the trial court's answers to these specific questions, we shall first address the Department's overarching arguments which color its entire brief and suggest that no enforcement of *Conlan I* is appropriate. Foremost among these contentions is the Department's assertion that it cannot comply with *Conlan I* until it has secured vast amounts of additional funding.[8]

---

[8] The Department also argues that a 2002 decision of the United States Supreme Court, *Gonzaga Univ. v. Doe* (2002) 536 U.S. 273 [153 L.Ed.2d 309, 122 S.Ct. 2268] (*Gonzaga*), indicates that there is no enforceable individual right to compliance with the comparability requirement. The Department acknowledges that it did not make this assertion when *Conlan I* was before this court because, it says, the cases were decided "contemporaneously." However, *Gonzaga* was filed on June 20, 2002, and oral argument in *Conlan I* was heard on August 21, 2002, and the opinion did not issue until September 30, 2002. Moreover, not only did the Department fail to bring this case to the attention of the court in the prior appeal when it had the opportunity to do so, it did not raise the issue at any time during the extended hearings in the trial court over compliance.

In all events, *Gonzaga* dealt with the Family Educational Rights and Privacy Act, and held that the act creates no personal rights enforceable under 42 United States Code section 1983. In *Wilder v. Virginia Hospital Assn., supra,* 496 U.S. 498, the Supreme Court held that the

## A. *Funding issues*

The Department asserts three reasons why it cannot afford to implement a plan that would bring its practices into compliance with *Conlan I*. First, it asserts that nothing may be done until the state approves a budget that includes money for the changes. Second, it argues that compliance would jeopardize federal funding (known as Federal Financial Participation, or FFP) for the entire Medi-Cal program. Finally, it argues that if it begins to allow Medi-Cal recipients to be reimbursed before a formal plan is constructed, it risks incurring crushing penalties under a 25-year-old consent decree in another action. None of these contentions excuses timely compliance with the Department's duties.

In initially opposing the motion for enforcement, the Department argued that it was acting in good faith to implement *Conlan I*. The Department outlined steps it had taken to implement the changes required by *Conlan I*: "[1] The Department submitted trailer bill language to fiscal forecasting . . . along with the estimated fiscal amount needed for implementation. . . . [2] If the funding request is included in the budget for fiscal year 2003–2004, it must first be passed by the Legislature and the necessary legislation signed by the Governor . . . . Upon the Governor's signature, the Department's fiscal intermediaries Electronic Data Systems (EDS) for the Medi-Cal fee-for-service program and Delta Dental for the Medi-Cal dental program, both private companies, can start work on the system changes. EDS and Delta Dental have estimated thirteen months from the time they receive funding to completion. . . . [3] The Department has solicited and received a proposal from EDS for the required system changes. . . . The Department also has held several meetings with Departmental units and contractors to discuss and plan critical processes needed for implementation. . . . [4] The Department has completed a Budget Change Proposal (BCP) which will be submitted. The purpose[] of the proposed BCP is to acquire positions for Payment Systems Divisions and accounting staff that will be necessary to implement the Department's reimbursement process. . . . [5] The Department prepared and sent a memorandum to the [federal] Centers for Medicare and Medicaid Services (CMS) to advise CMS regarding the *Conlan* decision and confirm

---

provisions of Medicaid are enforceable by individuals. In *Gonzaga*, the court explicitly let that holding stand. The enforcement provisions of the Family Educational Rights and Privacy Act "squarely distinguish this case from . . . *Wilder*, where an aggrieved individual lacked any federal review mechanism." (*Gonzaga, supra,* 536 U.S. at p. 275; see also *Michelle P. ex rel. Deisenroth v. Holsinger* (E.D.Ky. 2005) 356 F.Supp.2d 763, 767–768.) Moreover, petitioners' claims to enforce their individual personal rights have been settled and are no longer before the court. The proceedings at this point concern only the petition under Code of Civil Procedure section 1085 to compel the Department to comply with its statutory obligations. Nothing in *Gonzaga* stands for the proposition that they may not do so.

necessary federal financial participation (FFP) availability for the Department's reimbursement process." (Fns. omitted.)

The Department then listed the steps it asserted "must also be completed before the Department's reimbursement process can be implemented: [¶] The Department must amend the currently existing fiscal intermediary contracts. It must also amend the interagency agreement with the Department of Social Services, which provides the . . . ALJs who hear fair hearing for Medi-Cal beneficiaries . . . . The Department must meet with and determine the necessary extent of interagency agreement amendments with the Department of Social Services regarding the reimbursement process and incorporating the right to a fair hearing to contest Departmental determinations."

Next, the Department set forth "the major barriers to implementing any reimbursement process in response to appellate court's decision . . . : [1] The lack of a State budget to fund the necessary expenditures. . . . The Department has preliminarily estimated additional annual costs of: $30 million for fiscal intermediary costs, $1.1 million for Department staff, $1 million for Department of Social Services Administrative Law Judges, and $2.5 million for Medi-Cal program reimbursement of beneficiaries. . . . [2] The lack of current Department staff positions necessary to administer such a new process. The Department will require contract oversight and accounting staff in order to implement a beneficiary reimbursement process. The Department will also require regulations to specify the exact reimbursement process as well as beneficiary claim review criteria.[9] The number of staff needed and the extensiveness of the program and system changes required precludes the Department from redirecting existing staff because other essential program and state work could not be completed. . . . [3] The lack of any current process to review and pay any beneficiary claims, either as an interim or a long-term process. Currently, the Department does not have the capacity to perform this function . . . . [4] The length of time needed by the fiscal intermediaries to implement any changes. EDS and Delta Dental have proposed a minimum of thirteen months from the time they receive funding to accomplish the necessary system changes. The Department will need six to twelve months to hire and train the necessary State staff following approval of state funding."

At the April 30, 2003 hearing on the motion for enforcement, the Department asserted, "there is also the issue of federal financial participation. And the state is only participating in Medicaid to the extent that it receives funding from

---

[9] This opposition was filed on April 14, 2003, and makes no mention of the 2002 amendments to section 14019.3, subdivisions (a) and (j), which provide that the Department may directly reimburse beneficiaries and that "this section may be implemented with a provider bulletin or similar notification, without any further regulatory action."

them, and there is no guarantee there will be funding to provide this reimbursement. And if there is no funding to provide the reimbursement, then we are in a situation where the court is ordering a brand new state-only program which is not subject to the comparability provisions. Because those comparability provisions are federal provisions which would only apply to the extent that the state is receiving money from the federal government, which there is no confirmation that they will receive yet."

In its papers submitted in support of its motion to approve the compliance plan, the Department continued to argue that financial considerations outside of its control hindered compliance. The Department reiterated, "California participates in Medicaid only to the extent that Medi-Cal receives reimbursement in the form of FFP for its services. [Citation.] [¶] The Department has sought, but has not yet been received [*sic*], approval for FFP based upon the criteria set forth in the proposed Compliance Plan. . . . If Federal Financial Participation is denied, then this Court may not require the Department to pay these claims." The Department argued, "In order to develop and implement the claims evaluation and reimbursement processes, massive system changes will be required to the Medi-Cal Program, which will include additional state staff in order to provide beneficiary claims evaluation and reimbursement."

Ironically, by way of illustrating its doomsday scenario, the Department submitted an October 7, 2003 letter to its director from the federal agency regulating state Medicaid programs, Center for Medicaid and Medicare Services (CMS) (formerly the Health Care Financing Administration), informing the Department that its federal funding was being reduced because of the Department's failure to comply with other federal requirements.[10] Tellingly, the letter stated that the reduction "pertains to California consistently overestimating its Medicaid (called Medi-Cal) administrative expenditures. The State has overestimated its budgeted administrative expenditures in each of the last eight quarters. The overestimates have ranged from 7.48 percent to 30.43 percent."

---

[10] The first among these the letter describes as follows: "We reduce the grant award by $16,388,000 (FFP) which represents forty percent of the costs, resulting from the *Craig v. Bonta* court order . . . . A California Superior Court Order dated June 24, 2002 in the lawsuit *Craig versus Bonta* required the State to develop and implement a process to ensure recipients losing SSI receive a redetermination before termination within 120 days of the Court's order. Due to a delay in obtaining a court-approved implementation plan, the State did not issue instructions for the redetermination process until May 6, 2003. The State's timeline for completing all of the redeterminations (which have been suspended in a backlog status since July 2002) is January 1, 2004. The State estimated that forty percent of these recipients losing SSI might not be eligible for Medicaid."

### 1. *State and federal financing*

As to the availability of federal funding, the Department inverts the logic of *Conlan I.* There, this court held that *because* California receives federal funds for the Medi-Cal program it must comply with the federal requirements by providing a means of reimbursement to Medi-Cal participants. Now the Department insists that it *cannot* comply with these requirements *until* the federal government assures it that funding will be provided. The Department argues that it needs to obtain assurances of Federal Financial Participation from CMS to implement *Conlan I.* "[W]ithout CMS approval, and in turn FFP, such reimbursements would lie outside of the Medi-Cal program, and thus, outside the parameters of *Conlan.*" Yet the very basis of the holding in *Conlan I* is that the Department is violating the federal comparability requirement by failing to refund money to those who are entitled to such refunds. California receives federal funding for Medi-Cal through the federal Medicaid program. "State participation in Medicaid is voluntary but if a state participates, it must comply with the federal statutes and regulations governing the programs." (*Conlan I, supra,* 102 Cal.App.4th at p. 753.) It was the Department's failure to comply with the federal regulations requiring comparable benefits to participants that prompted the decision in *Conlan I.* To now argue that the Department must ensure that additional federal funds are available before complying with this court's decision ignores the fact that the Department has received and continues to receive federal Medicaid funds and is obligated to comply with the requirements of the federal statute. As illustrated by the October 3, 2003 letter from CMS cited above, receipt of federal funds may be endangered by the Department's failure to comply with these requirements.

Federal regulations indicate that federal funding is available for reimbursements made in response to this court's ruling in *Conlan I.* Title 42 Code of Federal Regulations part 431.250(b)(2) (2004) provides that FFP is available for payments made "[f]or services provided within the scope of the Federal Medicaid program and made under a court order." Subdivision (d) of that part provides that FFP is available for "[p]ayments made to extend the benefit of a hearing decision or court order to individuals in the same situation as those directly affected by the decision or order." Courts in other states have imposed the same or similar requirements on their Medicaid programs and no one has suggested that those states have lost their federal funding. (See, e.g., *Blanchard v. Forrest* (5th Cir. 1996) 71 F.3d 1163; *Kurnik v. Dept. of Health & Rehab. Serv.* (Fla.Dist.Ct.App. 1995) 661 So.2d 914; *Krieger v. Krauskopf* (1986) 121 A.D.2d 448 [503 N.Y.S.2d 418]; *Lustig v. Blum* (1981) 80 A.D.2d 558 [435 N.Y.S.2d 350]; *Cohen by Cohen v. Quern* (D.C.Ill. 1984) 608 F.Supp. 1324.)

What is more, the Department's dire cost predictions ring hollow. Immediately upon remand the Department began objecting that implementing a plan that would comply with *Conlan I* would cost millions of dollars. The Department "preliminarily estimated additional annual costs of: $30 million for fiscal intermediary costs, $1.1 million for Department staff, $1 million for Department of Social Services Administrative Law Judges, and $2.5 million for Medi-Cal program reimbursement of beneficiaries. . . ." These numbers were submitted before any plan had been drafted. In support of its motion to approve the nebulous plan it later submitted to the court,[11] DHS predicted "enormous potential reimbursement costs to the State required by *Conlan* . . . . [T]he estimated annual reimbursement cost for persons newly eligible to receive Medi-Cal ranges from a low of $7,422,000 to a high of $99,258,000 . . . , while the projected annual reimbursement cost of copayments for persons on Medi-Cal with Other Health Coverage ranges from $4,000,000 to $24,555,000."[12]

---

[11] When asked to approve the plan, the trial court stated, "Maybe I just have trouble reading government plans. I read through this and I have a lot of trouble finding out what is going to happen. What are you going to do?" We share the trial court's quandary. The proposed implementation plan identifies 13 "steps," one of which is "Budget is signed by the Governor and is enacted with requested funding and trailer bill language is incorporated." The plan is arranged into "preinterim," "interim" and "permanent" processes, each of which requires, among many other things, the electronic data systems (EDS) staff to "work with the provider to get the beneficiary reimbursed" (the preinterim and interim processes add the caveat "as resources permit"). Under the permanent process, "If the Medi-Cal enrolled provider will not cooperate, EDS will directly reimburse the beneficiary for approved costs and start" a separate process directed to the provider. "If the non-enrolled provider will not cooperate," the plan recites, "DHS cannot directly reimburse the beneficiary or force the provider to cooperate."

[12] In the declaration submitted to support this statement, the Chief of the Fiscal Forecasting and Data Management Branch (FFDMB) stated that "[t]he local assistance cost of administratively implementing the provisions of *Conlan* has been identified by the Medi-Cal fiscal intermediaries. For Electronic Data Systems (EDS), which processes medical claims for the Medi-Cal Program, EDS has identified costs as approximately $1,148,000 in Fiscal Year 2002–2003 and $6,668,000 in Fiscal year 2003–2004. There will also be ongoing costs. (Fn. omitted.) Delta Dental . . . has identified costs of approximately $1,530,000 in Fiscal Year 2002–2003 and $1,000,000 in Fiscal Year 2003–2004. There will also be ongoing costs." No explanation was provided of what the "ongoing costs" would be.

The supporting declaration explained that these numbers were derived in this manner: "In order to determine the potential impact of *Conlan v. Bonta* on the benefit costs for new eligibles, FFDMB completed a study of eligibles who were new in March 2002 (not on Medi-Cal in the previous two months.) Based on this study, I estimated that approximately 1,000 of the persons eligible for Medi-Cal each month are retroactive eligibles, that is, their eligibility is for one of the three months prior to the month in which they applied for Medi-Cal, with an average cost of $729 per month, and that approximately 155,000 are regular eligibles reported retroactively because of the time it took to determine their eligibility, with an average monthly cost of $352. The data available does not identify the additional benefits that will be paid for under the requirements of *Conlan*. As there is insufficient data about the services Medi-Cal beneficiaries pay for out-of-pocket for which they cannot get reimbursed once they are found eligible, I made a number of assumptions to determine the potential cost range for *Conlan* after its provisions are fully implemented. I assumed that, at a minimum, there would

Before *Conlan I*, DHS routinely reimbursed providers for covered services provided during a Medi-Cal recipient's retroactivity and evaluation periods and the provider then reimbursed the recipient. It was only when that system failed and the Medi-Cal beneficiary did not obtain reimbursement from the provider that a problem arose. The Department has never disputed that beneficiaries such as Conlan and Schwarzmer are entitled to be reimbursed for their covered expenses incurred during these periods. In commenting on petitioners' response to its proposed notice below, the Department stated, "Enrolled provider-based remedies are not only available now to beneficiaries, but they always have been. The existing provider process is not new. Petitioners' assertion that the Department is not making available enrolled provider-based reimbursement of evaluation period expenses is just plain wrong. Nearly all beneficiaries are getting paid from the existing enrolled provider-based reimbursement process. *The overwhelming majority of beneficiaries are getting their money.*" (Italics added.) Under the former section 14019.3, providers first received payment from the Department before reimbursing the beneficiary. *Conlan I* did not create a new class of claimants; it mandated only the adoption of some procedure to ensure that existing claimants receive the reimbursement to which they have always been entitled.

Petitioners may have stated the point most succinctly in a letter which they sent to CMS that is included in the record: "Under DHS' process prior to *Conlan*, a recipient could be paid if her provider requested and received reimbursement from DHS and then reimbursed the recipient. *Conlan*, 102 Cal.App.4th at 755–[7]58. Full FFP is available for this process. The *Conlan [I]* decision merely reshapes the process and orders DHS to devise a plan to ensure that beneficiaries actually get paid. This can be done either through direct reimbursement or through a system which ensures that providers promptly reimburse recipients. *Id.* at 764. The reimbursement itself—for which FFP is already available—is unchanged in form and purpose, while *Conlan* merely replaces the vehicle that carries it to the recipient."

■ In any event, an agency may not use lack of funding to excuse failure to comply with the law. In *Mooney v. Pickett* (1971) 4 Cal.3d 669 [94 Cal.Rptr. 279, 483 P.2d 1231], San Mateo County denied general assistance benefits to employable single men. The Supreme Court held that this violated state law, and rejected the county's contention that it could not afford to offer these men assistance because doing so would double the cost of the general assistance program. "We are aware of the financial difficulties which attend present welfare programs on local, state, and national levels. This court,

be a 10% increase in the cost for retroactive eligibles plus a 1% increase in the cost for eligibles reported retroactively. This minimum cost would be $7,422,000. I also assumed that the maximum increase would be a 20% increase in the cost for retroactive eligibles, plus a 15% increase for eligibles reported retroactively. Based on this, the maximum cost would be $99,258,000." (Fn. omitted.)

however, is not fitted to write a new welfare law for the State of California, and while the Legislature addresses itself to that task it remains our task to enforce the existing law. We observe that the county retains extensive authority to establish standards for General Assistance, both as to eligibility and as to amount of aid. In view of this discretion, the county can surely find many ways which do not violate state statute in which it can limit General Assistance payments to the financial resources available." (*Id.* at p. 680.)

Likewise, in *Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384 [211 Cal.Rptr. 758, 696 P.2d 150], the Supreme Court invalidated "priorities" set by the Director of the Department of Developmental Services (DDS) that would have cut entire categories of benefits without regard to the needs of individual aid recipients. "To be sure, as defendants contend, the regional centers may spend no more money to provide services than the Legislature has appropriated. Contrary to defendants' apparent belief, however, this fact does not mean that the Act grants no right to any services at state expense, or that it grants the right to only such services as DDS can equitably provide to all eligible persons within the limits of the annual legislative appropriation. What it does mean, rather, is that so long as funds remain, the right must be implemented in full; as soon as they are exhausted, it can no longer be implemented, but may be financed through an additional appropriation if the Legislature so chooses." (*Id.* at p. 393.)

### 2. Ball v. Swoap *penalties*

In support of the motion to approve its implementation plan, the Department argued that a 1985 order from the Alameda County Superior Court in an action entitled *Ball v. Swoap* (No. H105716-0) would require the Department to pay crushing penalties if it failed to mail notice of fair hearing decisions to prevailing claimants within 90 days of their fair hearing requests. In *Ball v. Swoap*, the court retained jurisdiction to ensure that the Department reaches final hearing decisions in a timely manner. Here, DHS has argued, "In a bygone era, that Court decided that . . . monetary penalties would attach, apparently in perpetuity, during all the months subsequent to April 1, 1988 during which the ALJ process failed to produce timely decisions, as defined, in at least 95% of the active caseload." After setting forth the penalty schedule ordered in that case, the Department continued, "Simple arithmetic suggests that the potential pricetag of *Ball v. Swoap* penalties if there is not 95% compliance, as described, could cost the State from $3.35 Million . . . to $8.04 Billion in a worst case scenario where 67,000 fair hearing decisions are 40 months late. The simple point to be made is that any imposition of *Ball v. Swoap* penalties would spell certain disaster—certain financial disaster—in an environment in which it is indisputable, at the outset, that the present fair hearing process is wholly incapable of accommodating the floodgates that

will be opened to fair hearings unless they are all restricted and completely put out of reach, at least until the Plan's permanent process is completely implemented . . . ."

The assertion that complying with this court's order will cost the Department between $3.35 million and $8.04 billion because of penalties the court may impose in *Ball v. Swoap* is, to put it mildly, preposterous. The consent decree in *Ball v. Swoap* authorizes penalties only if the Department does not issue 95 percent of its fair hearing decisions within 90 days of the request for a hearing. The Department's estimate assumes that 1 percent of all Medi-Cal recipients, or 67,000 people annually, will request fair hearings as the result of having been denied reimbursement first by their providers and then by the Department itself, and that none of the 67,000 hearings will be decided within the 90-day limit. The Department provides absolutely no basis for such an assumption. There were only 8,274 administrative hearings in all other Medi-Cal cases in the most recent one year period for which statistics were available. In all events, even if the backload of fair hearing cases were to be affected by the decision in this case, the proper means of seeking relief from the penalty provision, if any relief is appropriate, is an application to the court in *Ball v. Swoap.*

■ "It is inherent in our system of judicial review of agency adjudication that once a court has passed on a question of law in its review of agency action, the agency cannot act inconsistently with the court's orders." (*George Arakelian Farms, Inc. v. Agricultural Labor Relations Bd.* (1989) 49 Cal.3d 1279, 1291 [265 Cal.Rptr. 162, 783 P.2d 749].) *Conlan I* recognizes the broad discretion of the Department to determine the most appropriate means to bring its practices into compliance with federal law. In seeking to carry out the mandate of this court, the trial judge displayed exceptional patience and willingness to tailor an order to accommodate the practicalities of the situation. But, as we stated in *Conlan I*, "While the method of accommodating such considerations is within the discretion of the Department, . . . ignoring the recipients' rights and doing nothing is not an option." (*Conlan I, supra*, 102 Cal.App.4th at p. 764.)

### B. *Issues relating to specific provisions of the implementation plan*

The Department contends that the trial court erred because "rather than directing DHS to develop a plan to comply with *Conlan*, the court attempted to direct the contents of that plan and improperly control DHS's discretion." That is hardly a fair characterization of the lengthy trial court proceedings. The Department requested additional time to formulate its implementation plan and then requested the court's approval of its plan. With the benefit of extensive briefing and argument, the court considered petitioners' objections to the plan submitted by DHS and the justifications advanced for not

including additional measures that petitioners contend are required either by this court's prior decision or other applicable provisions of law. The alternative would have been to immediately issue a writ of mandate as directed in *Conlan I* and address petitioners' objections and the Department's excuses for noncompliance in subsequent contempt proceedings. The Department resisted that approach and is hardly in position to criticize the trial court for having acceded to its requests for guidance. We now evaluate the trial court's determination of the disputed issues, so that implementation of an acceptable plan may proceed without further delay.

### 1. *To whom notice must be sent*

The trial court's order states that "Respondents have agreed to send the Notice [advising of the new procedure for obtaining reimbursement] to all current Medi-Cal recipients. They have indicated that they have no addresses for past recipients. It is unacceptable that all former Medi-Cal recipients, even those who terminated their participation yesterday, will be unable to recover their covered expenses simply because Respondents may not maintain a database of recipients. The Court encourages Respondents to locate a source of information that will identify former Medi-Cal recipients. While the Court understands that Respondents may not have current addresses for several of these individuals, Respondents should attempt to send the Notice to both current and former Medi-Cal recipients."

The Department has not directly questioned this portion of the court's order, and we discern no basis for doing so. To the extent practicable, notice of the new procedure should be given to all those who may have claims for reimbursement, including individuals who are no longer Medi-Cal recipients but whose potential claims are still viable. We share the trial court's skepticism that there are no means of identifying any former recipients, and trust that reasonable good faith efforts will be made to do so.

### 2. *Retroactivity*

*Conlan I* did not address the date to which that decision is retroactive. Following argument on this issue, the trial court ordered that "Every Medi-Cal recipient who received eligible medical services on or after June 27, 1997, the date this petition was filed, should receive the Notice." The Department argues that it has no duty to provide reimbursement to those who were enrolled in Medi-Cal prior to this court's decision in *Conlan I* and that "*any* form of retroactive monetary damages is barred by sovereign immunity."

The reimbursement of covered expenses is not a form of monetary damages barred by sovereign immunity. As indicated above, the Department

has never claimed that Medi-Cal beneficiaries are not entitled to reimbursement for covered expenses incurred during the retroactivity or evaluation periods, but only that DHS is not required to provide the reimbursement directly to the recipients. In *Hypolite v. Carleson* (1975) 52 Cal.App.3d 566 [125 Cal.Rptr. 221] (*Hypolite*), the plaintiffs represented a class who had been denied welfare benefits on the basis of a regulation promulgated by the Director of the Department of Social Welfare. The regulation was held to be invalid and the case was remanded to the trial court "with directions to grant a peremptory writ of mandate." (*Id.* at p. 574.) The trial court issued the writ, enjoined the Director from enforcing the invalidated regulation, ordered the administrative decisions regarding the named plaintiffs to be set aside and retained jurisdiction to determine retroactivity with regard to the class. The court ultimately decided that the " 'members of petitioners' class shall be entitled to the restoration of all those monies withheld pursuant to [the regulation] from' " the date that the original complaint had been filed. (*Id.* at p. 575.) The Court of Appeal held that the benefits were a debt owed to each class member "from the date he was 'first entitled to receive the aid.' " (*Id* at p. 584.) The court also held that "principles of 'equity, comity, and federalism' " embodied in the Eleventh Amendment to the United States Constitution did not bar the award of retroactive benefits because those principles only " 'restrain' a *federal* court in that context, they do not inhibit a California court in the present case . . . ." (*Id.* at pp. 584–585.) The court based its reasoning in part on an earlier decision holding that "a person who ha[s] been wrongfully denied public assistance benefits [is] entitled to 'the full payment thereof,' from the date he was *first entitled* to receive the aid,' upon the theory that '[t]he obligation to pay became a *debt* due' to him as of that date. [Citation.] To hold otherwise . . . would 'provide a money-saving device for the [debtor] counties at the expense of those of our citizenry least able to bear the burden thereof.' " (*Id.* at p. 583; see also *Tripp v. Swoap* (1976) 17 Cal.3d 671, 677 [131 Cal.Rptr. 789, 552 P.2d 749], overruled on other grounds in *Frink v. Prod* (1982) 31 Cal.3d 166, 180 [181 Cal.Rptr. 893, 643 P.2d 476] [ordering payment of benefits from the date application was filed] and *Green v. Obledo* (1981) 29 Cal.3d 126, 143 [172 Cal.Rptr. 206, 624 P.2d 256].)

This reasoning applies equally here. The trial court appropriately exercised its discretion in choosing the date back to which *Conlan I* would be applied. (See *Hypolite, supra,* 52 Cal.App.3d at p. 585 ["a practical application of the theory to a class of claimants requires that retroactive relief be granted back to a single date which has some relevance and which is feasible, in practical fact, when applied to the class under the realities of the situation"]; *Green v. Obledo, supra,* 29 Cal.3d at p. 142 ["the trial court, acting as a court of equity, has discretion to fix a more realistic starting date for the payment of retroactive benefits to class members"].) The trial court did not err in

considering *Conlan I* retroactive to the date on which the petition was filed,[13] and in ordering that notice be sent to past and present Medi-Cal beneficiaries.

### 3. *Expenses incurred during the evaluation period.*

The notice that DHS proposed sending to beneficiaries indicated that reimbursement would be available only for covered services provided during the three months before the beneficiary's application for benefits was submitted to Medi-Cal, and for the period between any denial of coverage and the determination that the denial was erroneous, but not for the period during which the application was being processed. The trial court concluded that such a gap in the period for which reimbursement is provided is not justified. "Under *Conlan*, DHS must also reimburse expenses incurred while the application is pending. This is precisely the situation in which petitioner Kevin Conlan found himself. He applied for coverage in October 1997 when his baby was born and the application was not granted until April 1998. When he applied for reimbursement for expenses incurred between October 1997 and April 1998, DHS denied reimbursement. The Court of Appeal found this treatment unacceptable and ordered DHS to create a plan that would cover the situation that Kevin Conlan faced. Accordingly, the Notice should indicate that recipients can apply for reimbursement for the three-month period before they applied for Medi-Cal benefits, for the time period during which their application was pending, and for the time period between a denial of their application and the reversal of that decision."

The Department continues to argue that *Conlan I* requires the Department to ensure reimbursement of expenses incurred only during the retroactivity period—the 90 days before an application for Medi-Cal benefits is submitted—and not during the evaluation period—the period between submission and approval of the application. In the Department's view, an individual enrolled in the Medi-Cal program must receive reimbursement for covered expenses incurred for three months before applying to the program and is covered for services after being admitted into the program, but has no recourse to obtain reimbursement for covered expenses incurred between those two periods, while the application was being processed. DHS urges this nonsensical conclusion based on the fact that the opinion in *Conlan I* speaks only of the "retroactivity period." But that is because in the original litigation the parties disputed only the right to obtain reimbursement for the earlier period. There was no question that if a method of reimbursement were

---

[13] This date is also somewhat arbitrary since Conlan, Schwarzmer and Stevens were enrolled in Medi-Cal and incurred their expenses well before that date. However, as the *Hypolite* court noted, there must be some practical date to encompass a class of claimants. Petitioners do not argue that benefits should be extended to an earlier date and agree that June 27, 1997, is a logical and reasonable cutoff date.

required for covered services provided before submission of an application for benefits, no less would be required for the period during which the application is pending. The claims of two petitioners—Conlan and Schwarzmer—included reimbursement for services obtained after their applications had been submitted and it was never suggested that those claims should be treated differently from claims arising during the retroactivity period. (See *Conlan I, supra,* 102 Cal.App.4th at p. 750.) No possible rationale for such differentiation has ever been suggested.

■ Regardless of what was addressed explicitly in *Conlan I,* the Department's position is contrary to the requirements of section 14019.3, subdivision (a)(1), as that section was recently amended. The statute now provides that a beneficiary is entitled to reimbursement from the provider "or directly from the department" of any payment for covered services that "[w]as rendered . . . after application for but prior to the issuance of, his or her Medi-Cal card." Indeed, DHS acknowledged as much when corresponding with CMS. The Department wrote to the associate regional administrator for Medicaid to "solicit support, receive clarification, and to confirm that federal financial participation (FFP) will be available when the Department acts in response to" *Conlan I.* In that letter, it stated that since *Conlan I,* "the Department has been in discussions with petitioners' attorneys and the scope of this decision has been determined by our Office of Legal Services to be extensive. Recoupment of expenses incurred by the Medi-Cal beneficiary from the provider of services and reimbursement of the beneficiary for these expenses includes services received during three distinct time periods, (1) the three months retroactive eligibility period (three months retroactive from the date of application for Medi-Cal eligibility), (2) *during the period of eligibility determination* (from the date of application to receipt of the Medi-Cal card), and (3) at least for the purposes of co-payments, the post eligibility period." (Italics added.)

Plainly the trial court was correct in determining that the implementation plan and the notice of the plan must include the so-called evaluation period.

### 4. *Services obtained from non-Medi-Cal-enrolled providers*

In its March 3, 2004 order, the trial court answered the disputed question, "Will covered services rendered by non-Medi-Cal providers be eligible for reimbursement?" as follows: "As a part of the Medicaid program, Medi-Cal must provide comparable medical services to every participant. Accordingly, each participant must be reimbursed whether they received covered services from a Medi-Cal provider or from a non-Medi-Cal provider. Respondents suggest that non-Medi-Cal providers could apply for temporary Medi-Cal participation. This proposed solution creates a new version of the same

problem presented in *Conlan*. The non-Medi-Cal providers have no financial incentive to apply for temporary Medi-Cal status and thus, most likely will not. If even one doctor does not apply, the comparability provision of the Medicaid Act would be violated. In order to comply with *Conlan*, this Court requires that Respondents' Notice inform Medi-Cal recipients that they may be entitled to reimbursement for covered services provided by either Medi-Cal or non-Medi-Cal providers."

The Department contends it should not be required to provide reimbursement for medical services supplied by providers that are not enrolled in Medi-Cal and subject to its restrictions. We conclude there is partial merit in the views of both the trial court and the Department. A distinction must be drawn in this respect between the retroactivity and evaluation periods. Absent evidence of fraud, the Department must provide reimbursement for covered expenses paid to any provider during the retroactivity period, but only for services from enrolled providers during the evaluation period, provided that applicants are given notice at the time they apply for benefits that only services from enrolled providers will be reimbursed.

In *Carroll v. DeBuono* (N.D.N.Y. 1998) 998 F.Supp. 190, a group of Medicaid recipients in New York State were denied reimbursement for expenses incurred during the retroactivity period because the services were rendered by non-Medicaid providers. The state agency administering the program had promulgated a regulation declaring that reimbursement was available only where "the medical care and services were furnished by a provider en rolled in the Medicaid program." (*Id.* at p. 193, italics omitted.) The court held this regulation was invalid. "To begin, the federal retroactive eligibility statute does not, by its terms, limit reimbursement during the retroactive period to only persons obtaining care from Medicaid-enrolled providers. 42 U.S.C. § 1396a(a)(34). Nor can such an express limitation be found in any federal regulation. *See* 42 C.F.R. § 435.914." (*Carroll v. DeBuono, supra,* at p. 196.) "The statute's purpose is to ensure that otherwise eligible persons receive financial protection prior to application." (*Ibid.*)

The court rejected the agency's argument, similar to that made by DHS, that fraud prevention is a compelling reason for limiting reimbursement to Medicaid enrolled providers for services obtained during the retroactivity period. The court reasoned "that fraud, whether individually perpetrated by the preapplicant or medical provider, or through collusion between these parties, appears particularly unlikely in the situation at issue here. Preapplication individuals are unlikely to be aware that Medicaid coverage might be forthcoming, and as such are unlikely to engage in fraud. Likewise, hospitals or other facilities rendering services to such individuals have no motivation to engage in fraudulent service provision or charging practices either. To the

extent that a hospital or providing doctor is more likely to be cognizant of potential current Medicaid eligibility of the preapplicant, and therefore perhaps more likely to be tempted by Medicaid fraud, two factors balance against such an occurrence. First, the providers in question here are those not enrolled currently as Medicaid providers. It is safe to assume that such providers are less familiar with the Medicaid requirements and are actually less likely to be able to predict which currently non-covered patients are actually of 'preapplicant' status and therefore 'good prospects' for fraud with subsequent Medicaid re-payment. Second, because indigent patients are a poor risk for re-payment of medical expenses to begin with, it is unlikely that a medical provider would make a habit of extending unneeded or unnecessarily expensive treatments to such patients in the hopes that, within the next three months, the patient would apply for and be approved for Medicaid, enabling the provider to collect on the expensive treatments. Similarly, collusion between the preapplicant and a medical provider to defraud the Medicaid system is equally unlikely. The preapplicant is simply too ignorant of the system and their status within it, while the physician or other health care provider lacks sufficient motivation to engage in such fraud where the likelihood of remuneration from the government is uncertain." (*Carroll v. DeBuono, supra*, 998 F.Supp. at p. 197.)

The same result was reached in *Blanchard v. Forrest, supra,* 71 F.3d at pages 1168–1169, where the court held that "42 C.F.R. § 431.51(b)(1)(ii) . . . requires that a state plan must provide that a recipient may obtain Medicaid services from any provider that is 'willing to furnish [the services] to that particular recipient.' " Likewise in *Seittelman v. Sabol* (1995) 217 A.D.2d 523 [630 N.Y.S.2d 296], affd. (1998) 91 N.Y.2d 618, 627 [674 N.Y.S.2d 253, 697 N.E.2d 154], the court held that Medicaid beneficiaries must be reimbursed for qualifying medical expenses incurred during the retroactivity period, even if those expenses were obtained from a non-Medicaid provider. That court also rejected the asserted fraud-prevention rationale, reasoning that "[p]rior to the time of application, prospective recipients have no way of knowing that such a requirement is in effect and, therefore, no opportunity to limit their choice of medical providers to participants. The Regulation 'may not be applied with a literal rigidity that would effectively deny to eligible persons intended medical assistance.' " (*Id.* at p. 525.) The *Seittelman* court went on to hold that reimbursement could be denied for services obtained from non-Medicaid-enrolled providers during the evaluation period, but only if, upon application, the applicants were informed that they must seek medical services from Medicaid-enrolled providers from that point forward in order to be eligible for reimbursement. (*Id.* at pp. 525–526.)

■ The reasoning of these courts is sound. Prior to applying for Medi-Cal benefits, those later deemed entitled to state aid during the retroactivity

period cannot reasonably be expected to know that they are limited in their choice of provider. Denying reimbursement to those who paid their non-Medi-Cal-enrolled providers during the retroactivity period would violate the comparability requirement in much the same way as the Department's initial policy did. Those Medi-Cal recipients who paid their non-Medi-Cal-enrolled providers would receive fewer benefits than those who did not.[14]

However, we agree with the *Seittelman* court that the Department may limit reimbursement to enrolled providers during the evaluation period, *provided* that the Department gives notice to applicants at the time they apply for benefits that reimbursement for covered expenses will thereafter be made only for services obtained from enrolled providers.

Section 14019.3, as amended, provides that "[i]f a provider is not currently enrolled in the Medi-Cal program, the department shall assist in that enrollment. Enrollment in the Medi-Cal program may be made retroactive to the date the service was provided." (§ 14019.3, subd. (g).) The temporary or retroactive enrollment of a provider may in some cases enable the prompt reimbursement of covered expenses. However, as the Department's proposed implementation plan recognizes, DHS has no authority to compel a provider to enroll in Medi-Cal. If its efforts to encourage enrollment should be unsuccessful, prompt direct reimbursement to the beneficiary may be the only means by which the Department can fulfill its statutory obligations.[15]

## 5. *Rate of reimbursement*

Finally, the trial court's March 3, 2004 order addressed the rate at which the Department must provide reimbursement, and concluded as follows: "The compliance plan must fully reimburse Medi-Cal participants for their out-of-pocket expenses. As stated above, participants are entitled to seek reimbursement for expenses paid to non-Medi-Cal providers. In addition, the Medi-Cal recipients are entitled to full reimbursement, not simply reimbursement at the Medi-Cal rate for their covered services. As Petitioners point out, singling out a group of recipients for only partial payment, while other participants receive full payment, would violate the comparability provision of the Medicaid Act relied upon by the Court of Appeal."

---

[14] To the extent that amended section 14019.3 requires that a provider have been enrolled in Medi-Cal at the time services were provided to qualify for reimbursement, the statute conflicts with the comparability requirement and thus is invalid.

[15] The proposed implementation plan submitted by the Department states, "If the non-enrolled provider will not cooperate, DHS cannot directly reimburse the beneficiary or force the provider to cooperate." As noted above, in addition to the force of this court's ruling in *Conlan I*, section 14019.3, subdivision (a) now expressly authorizes reimbursement directly to the beneficiary. Thus, the trial court properly refused to approve a plan excluding the possibility of direct reimbursement in such cases.

In *Schott v. Olszewski* (6th Cir. 2005) 401 F.3d 682, the Sixth Circuit held that Medicaid recipients are entitled to full reimbursement of their out-of-pocket expenses. Reviewing cases in which courts have held that recipients are entitled to reimbursement (including *Conlan I*), *Schott* observed that "all of the arguments that support permitting direct reimbursement in the first place also support reimbursement at the out-of-pocket rate. Singling out a group of recipients for partial payment and providing full reimbursement to others violates the comparability provision of the Medicaid Act in the same way that distinguishing between those who paid for their care and those whose bills remain unpaid violates the provision. Where some Medicaid recipients are forced to pay for a portion of their treatment out-of-pocket while others are required to pay nothing for their treatment, the recipients have not received medical assistance of equal value." (*Id.* at p. 692.) The *Schott* court went on, "The Medicaid program, like all public benefit programs, requires a careful balancing of costs and benefits. [Citation.] Both the financial integrity of the program and the need of individual recipients must be considered. Failure to reimburse recipients for all of their expenses, however, shifts the burden of spiraling health care costs onto those who can least afford it, which is inconsistent with the very purpose of the Medicaid program." (*Ibid.*) The court noted that if the state did not want to pay the higher costs, it had "the option of requiring that providers issue refunds to individuals who pay for services rendered during the retroactive-coverage period and then seek payment from Medicaid at the reduced rate." (*Ibid.*)

The same result was reached in *Greenstein by Horowitz v. Bane* (1993) 833 F.Supp. 1054. There the court held that "In terms of purchasing power, plaintiffs are not being treated equally to other Medicaid recipients. When plaintiffs are allotted the same amount of money Medicaid provides to other recipients, but are forced to pay for treatment or services which are furnished to ordinary Medicaid recipients without charge, plaintiffs have not received assistance equal in amount to the assistance received by these other recipients who pay nothing. As compared with other Medicaid recipients, plaintiffs' medical assistance has diminished in value." (*Id.* at pp. 1073–1074; see also *Lustig v. Blum, supra,* 80 A.D.2d 558 [full reimbursement required]; *Kurnik v. Dept. of Health & Rehab. Serv., supra,* 661 So.2d at p. 918 ["such person is entitled to be made whole for out-of-pocket expenditures made before eligibility is determined"]; *Cohen by Cohen v. Quern, supra,* 608 F.Supp. at p. 1332 [state Medicaid program must force providers who regularly participate in program to provide full refunds to beneficiaries for services obtained during the retroactivity period, and to accept reimbursement at Medicaid rates].)

However, in *Seittelman v. Sabol, supra,* 91 N.Y.2d 618, the court interpreted the comparability provision to require parity only in the dollar amount of reimbursement. The court reasoned, "If plaintiffs are reimbursed for

out-of-pocket costs, the State will likely be required to pay more to applicants who received services from non-Medicaid-enrolled providers during the three-month preapplication period and who paid their bills, than to those who were treated by Medicaid-enrolled providers, since the latter would be entitled to reimbursement at no more than the Medicaid rate. Requiring the State to pay these out-of-pocket costs creates the very situation the [comparability] provision was designed to avoid-the receipt by one class of Medicaid recipients of a greater amount of reimbursement dollars than another solely because some recipients visited a different group of providers. Such a rule would contribute to the creation of 'two classes of Medicaid recipients' . . . ." (*Id.* at p. 628.) The court continued, "It must also be recognized that the Medicaid system is premised upon the idea that the State and Federal governments will provide financial assistance to those in need but only within certain defined and accepted financial parameters. Reimbursement of Medicaid recipients' out-of-pocket expenses, which may be considerably higher than the Medicaid rate negotiated or exacted from enrolled medical providers, would be inconsistent with this premise and, thus, could not have been within the legislative intent." (*Id.* at p. 629.)

▮ Although the *Seittleman* court is in the minority on this issue, we find its reasoning more persuasive. The Medi-Cal system must balance the need to treat beneficiaries fairly and equally with the obligation of fiscal responsibility. The Department is obligated to provide the same level of benefits, but not to ensure that all beneficiaries are made whole. (See *King by King v. Sullivan* (D.R.I. 1991) 776 F.Supp. 645, 651–653.) Limiting reimbursement to the Medi-Cal approved rates does not treat applicants who have paid for covered services differently from those who have delayed their payment, since in both cases the amount of reimbursement will be the same and the beneficiary will be responsible for the excess. This system may "penalize" those who pay more than the covered amount, but that is the result of their having purchased from a more expensive provider rather than of any differentiation between Medi-Cal recipients.

C. *Conclusion*

▮ With the various issues concerning implementation of this court's prior decision resolved by the foregoing discussion, the Department should proceed to comply with the decision in *Conlan I* without further delay. Almost three years have elapsed since that decision was rendered, allowing far more time than should be necessary to permit orderly planning. More than eight years have elapsed since the petition in this case was filed and since some Medi-Cal beneficiaries incurred covered expenses to which they may be entitled to long-overdue reimbursement. Compliance may not await additional funding. By virtue of subdivision (j) of the amended section 14019.3,

implementation may proceed "with a provider bulletin or similar notification, without any further regulatory action." Should any additional questions concerning compliance arise, they should be presented to and resolved by the trial court as expeditiously as possible.

## DISPOSITION

Treating the Department's appeal from the order of March 3, 2004, as a petition for a writ of mandate, the petition is denied. The trial court did not abuse its discretion in refusing to approve the Department's proposed implementation plan and notice of that plan. The Department shall, within 30 days of this opinion becoming final, submit to the trial court a revised implementation plan and proposed notice in conformity with the trial court's order of March 3, 2004, as modified in conformity with this opinion.

Corrigan, Acting P. J., and Parrilli, J., concurred.